[No. S078537. May 7, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
ROSHAY D. CLEVELAND, Defendant and Appellant.

[redacted]

**COUNSEL**

James R. Bostwick, Jr., under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Carol Wendelin Pollack, Assistant Attorney General, Pamela C. Hamanaka, Richard B. Cullather and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, C. J.**—Defendant Roshay D. Cleveland was convicted, following a jury trial, of two counts of attempted second degree robbery. (Pen. Code, §§ 664, 211.) He argued on appeal that the trial court erred in discharging a juror, during deliberations, for failing to deliberate and for prejudging the case. The Court of Appeal reversed the judgment of conviction. We granted the People's petition for review to consider the standard a trial court should employ in deciding whether to discharge a juror under such circumstances, and to determine whether the Court of Appeal reached the correct result in this instance. We affirm the judgment of the Court of Appeal.

I

On the evening of September 20, 1997, Fernando Figueroa and Victor Medina were working behind the counter in a liquor store. Defendant, who was a regular customer, entered and purchased a bottle of tequila. Appearing upset, defendant said to Figueroa: "Give me the shit." Figueroa did not know what defendant meant. Defendant was hitting himself on the chest and acting strangely. Defendant then asked Figueroa for a gun. There was a gun under

the counter directly in front of Figueroa, but Figueroa never had mentioned the gun to defendant or showed it to him. Figueroa lied and said he did not have a gun. Defendant put his knee on the counter, grabbed Figueroa by the shoulders and moved him to one side. Figueroa activated a silent alarm and then shoved defendant off of the counter and forced him out of the store. When defendant attempted to reenter the store, Figueroa and Medina blocked the entrance. In Figueroa's opinion defendant "looked like he was drunk or something," and he kept asking for the gun. Finally, defendant walked away.

Within minutes, a police officer arrived in response to the alarm. Figueroa and the officer found defendant a few blocks from the store. When the officer approached him, defendant began cursing and pacing back and forth with his fists clenched, muttering that he had done nothing wrong. Defendant appeared to be under the influence of a narcotic. When defendant began walking away, the officer placed him under arrest, using pepper spray to subdue him. The incident in the liquor store was recorded by the store's security video camera. The recording, which was of poor quality, was played for the jury.

The presentation of the evidence, although spread over two days, took less than two hours. The focus of defense counsel's argument to the jury was that defendant did not form the required specific intent to steal, because he was intoxicated, and therefore he could not be convicted of robbery.

On the second day of deliberations, the jury sent the court a note stating: "We request an alternate to replace one juror. One juror does not agree with the charge and does not show a willingness to apply the law. One juror will not abide the facts and apply the law. Please provide direction in this matter." The court brought the foreperson (Juror No. 3) into open court, and she explained that one juror "could not even agree that a crime had been committed. It was no fault, no foul, and we are having a hard time attempting to have this person even, quote, unquote, apply the law in the five steps where it is outlined in the document that you gave us to read where it goes to the five points of what is attempted robbery." The foreperson stated that the juror "doesn't feel that there is a valid charge. That he cannot in all fairness and conscience state that there was any evidence to support that the defendant allegedly came in and was attempting to get the weapon that allegedly was behind the counter underneath the cash register." When asked whether the juror in question had made up his mind prior to deliberations and was refusing to discuss the case, the foreperson responded: "I don't know if I could say that their [sic] mind was made up before we went into the room." The foreperson explained that when other jurors asked this juror

to discuss his position, the juror responded: "You're not going to sway my mind, this is what I feel in conscience in looking at the big picture, no fault no foul, there's pushing and shoving on every football field, and the conversation goes from that point. [¶] Does not want to discuss the five points of the law as to attempted robbery . . . ." In describing the juror's conduct, the foreperson later added that the juror stated: "I cannot in conscience look at the evidence rendered and state that the person was really after the gun." When asked whether the juror listened to the other jurors, the foreperson responded: "Halfheartedly and then interrupts."

The entire jury was brought into the courtroom, and the court reread the following instruction: "The People and the defendant are entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision." The court then asked whether any juror "feels that any other juror or jurors are not following that instruction that I just gave you, that are not deliberating, that are not considering others' opinions, that have foreclosed discussion?" Ten jurors raised their hands. Juror No. 1 and Juror No. 10 did not. Outside the presence of the rest of the jury, the court individually questioned each of the jurors, except the foreperson (Juror No. 3).

Juror No. 2 stated that the elements of the offense "do not seem to matter" to one juror (later identified as Juror No. 1). Instead, Juror No. 1 would discuss "elements . . . that had nothing to do with the facts at hand or the case."

Juror No. 4 stated the jurors were discussing the "elements of the case" but explained that "we didn't get anywhere with [Juror No. 1]. . . . This individual was taking unreasonable interpretation. I mean, he has an interpretation, and the rest of us have a different interpretation." When asked whether Juror No. 1 would discuss the elements of the crime with the other jurors, Juror No. 4 answered: "Not in particular, no. In general terms . . . ."

Juror No. 5 stated that Juror No. 1 was not deliberating. When asked whether Juror No. 1 would listen to his fellow jurors and exchange views, Juror No. 5 answered: "He isn't applying the law. It's strictly his own personal opinion." When asked how Juror No. 1 responded when the other jurors questioned him about the elements of the crime, Juror No. 5 stated: "He responds, 'I cannot answer with a yes or no,' and goes into a really big

synopsis of what he speculates. He concludes with his own opinion and is clearly not taking the law into consideration." Juror No. 5 concluded by observing that Juror No. 1 was "not even acknowledging that the defendant was trying to get a gun."

Juror No. 6 stated that Juror No. 1 "has absolutely no interest in the law, your instructions, what we are supposed to consider, and is making judgments and speculations based on his personal feelings." When asked to elaborate, Juror No. 6 explained that Juror No. 1 would state that "we shouldn't even be here, this should not have even come to court, this is a minor incident which any of us could have done . . . ." According to Juror No. 6, Juror No. 1 "talks and talks and talks about everything except what we are supposed to be dealing with."

Juror No. 7 observed that Juror No. 1 "won't answer a question. . . . We are allowing him a chance to talk, and he talks about 15 minutes, and he even brings up things like police cars come and reminded him of Rodney King and all that stuff, and I told him that had nothing to do with this. He won't—you ask him a particular question, and he won't answer the question. He said, I've said all I want to say, I won't answer no questions."

Juror No. 8 stated that Juror No. 1 "is not following the instructions . . . ." When asked what happened when the other jurors discussed the elements of the crime, Juror No. 8 replied: "Well, he contradicts everything that we say, and he does—just doesn't want to go by the rules of the court and the laws . . . ."

Juror No. 9 opined that Juror No. 1 was "disregarding the facts altogether." Referring to questions posed to each juror concerning the elements of the crime, Juror No. 9 stated that Juror No. 1 "won't answer the questions. He goes off on a tangent of something else every time."

Juror No. 10 stated that it was "hard for me to say" whether Juror No. 1 was disregarding the court's instructions, but offered that Juror No. 1 appeared to be "disregarding the evidence . . . for some unknown reason." Juror No. 1 did not participate when the jury discussed the five elements of the crime.

Juror No. 11 stated that when the jury was discussing the elements of the crime, Juror No. 1 would state, "this is my opinion and you have a right to your own opinion." Juror No. 11 said that the jurors collectively were asking each juror to answer questions concerning each element of the crime, but Juror No. 1 refused to answer, stating: "I can't do that."

Juror No. 12 said that Juror No. 1 "doesn't even seem to take [the elements of the crime] into consideration. It's his own feeling . . . . He keeps referring to he has to vote his own conscience . . . ." When asked whether Juror No. 1 participated in discussions of the elements of the crime, Juror No. 12 stated: "No, he has his own agenda, and he doesn't seem to take those into consideration, so you can't even discuss it."

The final juror questioned was Juror No. 1. When asked whether any juror was not deliberating, Juror No. 1 responded: "Not particularly, no." When asked whether he was participating in deliberations, he answered: "Yes, I certainly think I do, been participating in it for about a day, roughly. I have listened to other people, and they have listened to me. I have asked them to please be a little quiet. I present the whole case as I see it in its totality. I didn't want to go into the details of the case and mislead each other by arguing about various little things the way each juror sees it. I tend to present my view of the whole picture, and if other jurors, of course, don't like that view, then I just have to go with my own conscience." When asked whether he accepted the court's instruction concerning the elements of the crime, Juror No. 1 stated: "Yes. I have no problem with the law. I have only problems with the facts as I perceive them."

After Juror No. 1 had left the courtroom, the court observed that the "initial impression I get is that this juror talks about details as being not critical, and the details, it sounds to me, are details like elements of the offense. He just wants to get a broad, like, humanistic view of what's going on and not take what the law requires to be a more scientific elemental approach." Following argument by the parties, the court excused Juror No. 1 over defendant's objection, stating: "I do find that he is not functionally deliberating with the other jurors, that they would ask him specific questions as to elements and facts, and he refuses to respond, and you can't have a meaningful discussion unless you discuss what the particular facts and elements are. It doesn't do any good to talk in generalities as he does want to, so he is excused."

The court seated an alternate juror, and instructed the jury to begin its deliberations anew. Less than two hours later, the jury found defendant guilty as charged.

Defendant admitted having suffered a prior conviction for a serious felony and was sentenced to nine years in prison.

The Court of Appeal reversed the judgment of conviction, holding that the trial court "violated appellant's right to a unanimous jury by dismissing a

'holdout' juror and failing to develop a record showing beyond a 'doubt' and by a 'demonstrable reality' the dismissed juror's failure to deliberate and prejudging of the evidence." (Fn. omitted.)

## II

Penal Code section 1089 provides, in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors."[1] ■ (See also Code Civ. Proc., §§ 233, 234.) "We review for abuse of discretion the trial court's determination to discharge a juror and order an alternate to serve. [Citation.] If there is any substantial evidence supporting the trial court's ruling, we will uphold it. [Citation.] We also have stated, however, that a juror's inability to perform as a juror ' "must appear in the record as a demonstrable reality." ' [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 843 [55 Cal.Rptr.2d 347, 919 P.2d 1280].)

■ The most common application of these statutes permits the removal of a juror who becomes physically or emotionally unable to continue to serve as a juror due to illness or other circumstances. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1100 [31 Cal.Rptr.2d 321, 875 P.2d 36] [anxiety over new job would affect deliberations]; *People v. Johnson* (1993) 6 Cal.4th 1 [23 Cal.Rptr.2d 593, 859 P.2d 673] [sleeping during trial]; *People v. Espinoza* (1992) 3 Cal.4th 806, 821 [12 Cal.Rptr.2d 682, 838 P.2d 204] [sleeping during trial]; *People v. Dell* (1991) 232 Cal.App.3d 248 [283 Cal.Rptr. 361] [juror involved in automobile accident]; *Mitchell v. Superior Court* (1984) 155 Cal.App.3d 624, 629 [202 Cal.Rptr. 284] [inability to concentrate]; *In re Devlin* (1956) 139 Cal.App.2d 810, 812-813 [294 P.2d 466] [juror arrested on felony charge], disapproved on another ground in *Larios v. Superior Court* (1979) 24 Cal.3d 324, 333 [155 Cal.Rptr. 374, 594 P.2d 491].)

---

[1]As originally enacted in 1895, Penal Code section 1089 permitted the discharge of a juror and the substitution of an alternate juror only "before the final submission of the case" and only if "a juror die[s], or become[s] ill, so as to be unable to perform his duty." (Stats. 1895, ch. 213, § 1, p. 279.) In 1933 the statute was amended to permit substitution of an alternate juror "at any time, whether before or after the final submission of the case to the jury," and expanded the basis for doing so to include "if a juror requests a discharge and good cause appears therefor." (Stats. 1933, ch. 521, § 1, p. 1342.) In 1949, the statute was again amended to permit discharge if "upon other good cause shown to the court [the juror] is found to be unable to perform his duty." (Stats. 1949, ch. 1312, § 1, p. 2300.)

These statutes also have been applied to permit the removal of a juror who refuses to deliberate, on the theory that such a juror is "unable to perform his duty" within the meaning of Penal Code section 1089. In *People v. Thomas* (1994) 26 Cal.App.4th 1328 [32 Cal.Rptr.2d 177], the Court of Appeal upheld the dismissal of a juror who refused to deliberate, stating: "The juror did not answer the questions posed to him by other jurors, did not sit at the table with the other jurors during deliberations, acted as if he had already made up his mind before hearing the whole case, and did not look at the two victims in the courtroom. As the court concluded, Juror Bailey 'made up his mind before he went in there.' " (*Id.* at p. 1333.)

But caution must be exercised in determining whether a juror has refused to deliberate. California courts have recognized the need to protect the sanctity of jury deliberations. (*People v. McIntyre* (1990) 222 Cal.App.3d 229, 232, fn. 1 [271 Cal.Rptr. 467] ["The secrecy of jury deliberations should be closely guarded"]; *People v. Talkington* (1935) 8 Cal.App.2d 75, 85-86 [47 P.2d 368] [recognizing "the secrecy that should surround the deliberations of the jury"], disapproved on another ground in *People v. Friend* (1958) 50 Cal.2d 570, 578 [327 P.2d 97].) Penal Code section 167 makes it a misdemeanor to eavesdrop upon or record jury deliberations without the jury's consent. Under Evidence Code section 1150, once a verdict has been rendered, it can be impeached with evidence of misconduct, but evidence of the jurors' mental processes is inadmissible.[2] One reason for this rule is to "protect[] the stability of verdicts," an interest that does not apply in the present case because the inquiry was conducted before a verdict had been rendered. (*People v. Hutchinson* (1969) 71 Cal.2d 342, 350 [78 Cal.Rptr. 196, 455 P.2d 132].) But an additional reason that does apply here is to " 'assure[] the privacy of jury deliberations by foreclosing intrusive inquiry into the sanctity of jurors' thought processes.' [Citation.]" (*In re Hamilton* (1999) 20 Cal.4th 273, 294, fn. 17 [84 Cal.Rptr.2d 403, 975 P.2d 600].)

In *People v. Keenan* (1988) 46 Cal.3d 478, 540 [250 Cal.Rptr. 550, 758 P.2d 1081], it was alleged in support of a motion for new trial that, during deliberations, a juror had confronted the lone holdout juror, an elderly woman, stating: "If you make this all for nothing, if you say we sat here for nothing, I'll kill you and there'll be another defendant out there—it'll be

---

[2]Evidence Code section 1150, subdivision (a), reads: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

me." We concluded, as a matter of law, that this incident did not amount to prejudicial misconduct impeaching the verdict, stating that, although the "outburst . . . was particularly harsh and inappropriate, . . . no reasonable juror could have taken it literally." (*Id.* at p. 541.) Recognizing that " '[j]urors may be expected to disagree during deliberations, even at times in heated fashion,' " we concluded that "the alleged 'death threat' was but an expression of frustration, temper, and strong conviction against the contrary views of another panelist." (*Ibid.*) We added: "Thus, '[t]o permit inquiry as to the validity of a verdict based upon the demeanor, eccentricities or personalities of individual jurors would deprive the jury room of its inherent quality of free expression.' [Citation.]" (*Ibid.*)

Many of the policy considerations underlying the rule prohibiting post-verdict inquiries into the jurors' mental processes apply even more strongly when such inquiries are conducted during deliberations. Jurors may be particularly reluctant to express themselves freely in the jury room if their mental processes are subject to immediate judicial scrutiny. The very act of questioning deliberating jurors about the content of their deliberations could affect those deliberations. The danger is increased if the attorneys for the parties are permitted to question individual jurors in the midst of deliberations.

The need to protect the sanctity of jury deliberations, however, does not preclude reasonable inquiry by the court into allegations of misconduct during deliberations. Penal Code section 1120, for example, requires that such an inquiry be undertaken if it appears that a juror has personal knowledge of a fact in controversy. That statute requires a juror who has personal knowledge of a fact in controversy to "declare the same in open court" (*ibid.*) and further requires the jury as a whole to report instances in which a juror reveals such personal knowledge during deliberations: "If, during the retirement of the jury, a juror declare a fact which could be evidence in the cause, as of his own knowledge, the jury must return into court . . . [and] the juror making the statement must be sworn as a witness and examined in the presence of the parties in order that the court may determine whether good cause exists for his discharge as a juror." (*Ibid.*)

In *People v. McNeal* (1979) 90 Cal.App.3d 830 [153 Cal.Rptr. 706], the trial court received a note from the jury foreperson on the first day of deliberations indicating that one of the jurors possessed personal knowledge concerning the testimony of a defense witness. Defense counsel requested a formal hearing pursuant to Penal Code section 1120, but the trial judge declared that he was " 'not going into the facts.' " (*People v. McNeal, supra,* 90 Cal.App.3d at p. 836, italics omitted.) The juror at issue was questioned

outside the presence of the other jurors, but was instructed not " 'to go into factual matters.' " (*Ibid.*, italics omitted.) When asked whether she could deliberate fairly and impartially, the juror stated cryptically that she " 'still can't find that I can say "guilty" when I can't believe it.' " (*Ibid.*) Upon further questioning, the juror indicated she could disregard any information that was " 'outside the evidence,' " and she was permitted to rejoin the jury and resume deliberations. (*Ibid.*)

The Court of Appeal reversed the resulting judgment of conviction, holding that the trial court erred in failing to conduct a more extensive hearing, noting: "It is not enough for the juror alone to evaluate the facts and conclude that they do not interfere with his or her impartiality. [Citation.] . . . Once the court is alerted to the possibility that a juror cannot properly perform his duty to render an impartial and unbiased verdict, it is obligated to make reasonable inquiry into the factual explanation for that possibility." (*People v. McNeal, supra,* 90 Cal.App.3d 830, 838.)

In *People v. Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251], overruled on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 753 [80 Cal.Rptr.2d 734, 968 P.2d 445], the jury foreperson on the second day of deliberations told the court, outside the presence of the remainder of the jury, that Juror M. was intoxicated from drugs or marijuana and had been in that condition on the first day of deliberations as well. The foreperson reported that four jurors independently had noticed the smell of marijuana on Juror M. The court consulted with counsel and suggested that the court either examine Juror M. in chambers or replace her with an alternate. Defense counsel objected, but agreed with the court's further suggestion that he admonish the entire jury against using intoxicants. The jury returned verdicts of guilty the following day.

Relying upon the Court of Appeal's decision in *McNeal*, we held that the trial court erred in "failing to conduct a hearing adequate to ascertain Juror M.'s condition and whether her ability to deliberate was impaired." (*People v. Burgener, supra,* 41 Cal.3d 505, 518.) "[O]nce the court is put on notice of the possibility a juror is subject to improper influences it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and failure to make this inquiry must be regarded as error. [Citation.]" (*Id.* at p. 520.)

We have had frequent occasion to apply the rule announced in *Burgener*. In *People v. Keenan, supra,* 46 Cal.3d 478, 528, during penalty phase deliberations in a capital case, the jury foreperson sent the court a note stating: " 'One person doesn't remember that during the jury selection he

said we could vote for the death penalty.' " The court reinstructed the jury on its sentencing powers and duties. Later the same day, the jury foreperson sent a second note, stating there was " 'a juror who cannot morally vote for the death penalty.' " (*Id.* at p. 529.) The court indicated to counsel that it would have to " 'investigate' " whether " 'a juror . . . had misled us on the voir dire' " (*ibid.*) but, because it was Friday afternoon, the court first excused the jury for the weekend, telling the jury that it appeared they had a problem that the court was required to investigate.

On Monday morning, the jury foreperson was examined and stated that the problem apparently had been resolved, explaining that an unidentified juror had apologized, stating: " ' "I needed the weekend." ' " (*People v. Keenan, supra,* 46 Cal.3d 478, 531.) The jury was permitted to resume their deliberations and, within an hour, returned a death verdict.

On the ensuing automatic appeal of the judgment, this court rejected the defendant's argument that the trial court's "threat" to "investigate" the jury's "problem" unfairly coerced the dissenting juror, this court concluding instead that the trial court acted properly. We noted "that the court must investigate reports of juror misconduct to determine whether cause exists to replace an offending juror with a substitute" and observed that "[a] sitting juror's actual bias, which would have supported a challenge for cause, renders him 'unable to perform his duty' and thus subject to discharge and substitution." (*People v. Keenan, supra,* 46 Cal.3d 478, 532.) "Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists. [Citations.]" (*Ibid.*) We emphasized, however, that "any investigation must be conducted with care so as to minimize pressure on legitimate minority jurors." (*Id.* at p. 533.) We concluded that the foreperson's notes gave the court ample reason to investigate, because they suggested "that a juror or jurors were now expressing absolute refusal to consider the death penalty under any circumstances." (*Ibid.,* fn. and italics omitted.)

But not every incident involving a juror's conduct requires or warrants further investigation. "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] . . . [¶] As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case. [Citation.]" (*People v. Ray* (1996) 13 Cal.4th 313, 343 [52 Cal.Rptr.2d 296, 914 P.2d 846].) In *People v. Kaurish*

(1990) 52 Cal.3d 648, 694 [276 Cal.Rptr. 788, 802 P.2d 278], we held that a hearing was not required by a juror's having made a derogatory remark apparently directed at defense counsel (" 'Oh, you son-of-a-' ") when the defense rested its case, because it did not appear the remark was an indication that " 'improper or external influences were being brought to bear on a juror' " but, rather, was an expression of "momentary exasperation with the proceedings."

In *People v. Johnson* (1992) 3 Cal.4th 1183 [14 Cal.Rptr.2d 702, 842 P.2d 1], under circumstances akin to those present in the instant case, we held that an inquiry into whether a holdout juror should be discharged was not required. During penalty phase deliberations in a capital case, a juror sent a note to the judge that read: " 'Judge, I feel 11 of us have come to a decision, and one has not. It is not only myself but others feel this one person does not believe or ever did in the death penalty. Can she be disqualified?' " (*Id.* at p. 1253.) After conferring with counsel, the trial court sent back a note that declined to discuss this allegation and instructed the juror to keep her communications with the court to herself. The jury resumed deliberations and determined that the penalty should be death. We affirmed the resulting judgment, holding that the court properly declined to inquire into whether some jurors were coercing the dissenting juror, noting that "jurors can be expected to disagree, even vehemently, and to attempt to persuade disagreeing fellow jurors by strenuous and sometimes heated means. To probe as defendant suggests, in the absence of considerably more cogent evidence of coercion, would ' "deprive the jury room of its inherent quality of free expression." ' [Citations.] Consequently, the trial court was not required to make the inquiry for which defendant now argues. Moreover, any such inquiry could in itself have risked pressuring the dissenting juror to conform her vote to that of the majority. [Citation.] Defense counsel presumably was aware of the potential for such an outcome, and for that reason might have declined to request such an inquiry." (*Id.* at p. 1255.)

In *People v. Bradford* (1997) 15 Cal.4th 1229 [65 Cal.Rptr.2d 145, 939 P.2d 259], the trial court wisely conducted only a limited inquiry when faced with a request to discharge jurors. On the third day of deliberations in the guilt phase of a capital case, the trial court received a note from the jury foreperson stating that the jury had " 'big problems' " and could not continue deliberations. The court questioned the foreperson, who explained that the presence of " 'a few hostile jurors' " caused others jurors to feel they could not continue deliberations. (*Id.* at p. 1350.) The "hostile jurors" had expressed a fixed view of the case before all of the evidence had been reviewed. The court then asked the jury as a whole whether they could continue deliberations. Three jurors indicated they could not. The court

reread several jury instructions concerning the jury's duty to deliberate. The court advised the jury to put aside any hard feelings and resume deliberations. The jury deliberated 10 additional days before reaching a verdict. On automatic appeal, we held the trial court did not abuse its discretion. Although it was "inadvisable" for the "hostile jurors" to express a fixed view of the case early in deliberations, their action did not constitute misconduct. Because the jury continued to deliberate, there was no basis for discharging any of the jurors. (*Id.* at p. 1352.)

As several of the foregoing cases demonstrate, it often is appropriate for a trial court that questions whether all of the jurors are participating in deliberations to reinstruct the jurors regarding their duty to deliberate and to permit the jury to continue deliberations before making further inquiries that could intrude upon the sanctity of deliberations. It also is clear from the foregoing decisions that when reinstruction does not resolve the problem and the court is on notice that there may be grounds to discharge a juror during deliberations, it must conduct "whatever inquiry is reasonably necessary to determine" whether such grounds exist. (*People v. Burgener, supra,* 41 Cal.3d 505, 520.)

■ In addition to the numerous California decisions we have discussed, three federal cases have considered these issues in depth. Although these decisions are not binding upon us (*People v. Avena* (1996) 13 Cal.4th 394, 431 [53 Cal.Rptr.2d 301, 916 P.2d 1000] [" 'we are not bound by decisions of the lower federal courts, even on federal questions' "]), we consider them carefully for the guidance they provide.

*U.S. v. Brown* (D.C. Cir. 1987) 823 F.2d 591 involved a 69-count indictment charging, among other counts, several violations of section 1962(d) of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 United States Code section 1961 et seq. After 13 weeks of trial and five weeks of jury deliberations, the trial court received a note from one of the jurors stating that he was " 'not able to discharge my duties as a member of this jury.' " Upon being questioned by the court outside the presence of the other jurors, the juror explained that his difficulty stemmed from "the way the R.I.C.O. conspiracy act reads." The juror agreed that he was unable to follow the court's instructions because he disagreed with the law, adding: "It's the way [RICO]'s written and the way the evidence has been presented." The juror also stated, somewhat cryptically: "If the evidence was presented in a fashion in which the law is written, then, maybe, I would be able to discharge my duties." (*Brown, supra,* 823 F.2d at p. 594.) The court discharged the juror, because he indicated he could not follow the court's instructions. The court believed it could not question the juror any further,

because additional inquiry would intrude on the secrecy of the jury's deliberations.

■ The court of appeals began its analysis by noting that "a court may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence," stating that otherwise "the right to a unanimous verdict would be illusory." (*U.S. v. Brown, supra*, 823 F.2d 591, 596.) The court recognized, however, that the reason a request for discharge was made often will be unclear. Agreeing with the trial court that a court may not "delve deeply into a juror's motivations because it may not intrude on the secrecy of the jury's deliberations," the court of appeals observed that "unless the initial request for dismissal is transparent, the court will likely prove unable to establish conclusively the reasons underlying it." The court of appeals ultimately established the following rule: "[I]f the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." (*Ibid.*) The court in *Brown* reversed the judgment of conviction, concluding that the record "indicates a substantial possibility that [the juror] requested to be discharged because he believed that the evidence offered at trial was inadequate to support a conviction." (*Ibid.*)

*U.S. v. Thomas* (2d Cir. 1997) 116 F.3d 606 involved allegations by members of the jury that one of their number was acting improperly. Following a hearing at which members of the jury were questioned individually, the trial court discharged the challenged juror, finding he would not vote to convict "no matter what the evidence was." (*Id.* at p. 612.)

The court of appeals observed that "it would be a dereliction of duty for a judge to remain indifferent to reports that a juror is intent on violating his oath," and recognized that "a refusal to apply the law as set forth by the court constitutes grounds for dismissal." (*U.S. v. Thomas, supra*, 116 F.3d 606, 617.) But like the court in *Brown*, the court in *Thomas* was concerned that an inquiry into such matters might violate the sanctity of jury deliberations. We quote at length the court of appeals' cogent discussion on this point: "Courts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias during the course of a trial. This undertaking is particularly sensitive where, as here, the court endeavors to investigate allegations of juror misconduct during deliberations. As a general rule, no one—including the judge presiding at a trial—has a 'right to know' how a jury, or any individual juror, has deliberated or how a decision was reached by a jury or juror. The secrecy of deliberations is the cornerstone of the modern Anglo-American jury system. . . . Indeed, courts

and commentators alike recognize that the secrecy of deliberations is essential to the proper functioning of juries. It is well understood, for example, that disclosure of the substance of jury deliberations may undermine public confidence in the jury system [citation] and poses a threat to adjudicatory finality. Especially troublesome is the danger that such disclosure presents to the operation of the deliberative process itself. As one commentator has observed: 'Juror privacy is a prerequisite of free debate, without which the decisionmaking process would be crippled. The precise value of throwing together in a jury room a representative cross-section of the community is that a just consensus is reached through a thoroughgoing exchange of ideas and impressions. For the process to work according to theory, the participants must feel completely free to dissect the credibility, motivations, and just deserts of other people. Sensitive jurors will not engage in such a dialogue without some assurance that it will never reach a larger audience.' [Citation.] . . . 'Freedom of debate,' as Justice Cardozo wrote, 'might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world.' [Citations.] [¶] . . . In cases that generate much attention or passion in the community, or that involve allegedly dangerous persons or organizations, the mere suggestion that the views of jurors may be conveyed to the parties and the public, even after the trial is over, understandably may cause anxiety and fear in jurors, and distort the process by which a verdict is reached; actually making such information available to the public might invite the retribution that jurors would rightly fear. [¶] The jury system incorporated in our Constitution by the Framers was not intended to satisfy yearnings for perfect knowledge of how a verdict is reached, nor to provide assurances to the public of the primacy of logic in human affairs. Nor was it subordinated to a 'right to know' found in the First Amendment. The jury as we know it is *supposed* to reach its decisions in the mystery and security of secrecy; objections to the secrecy of jury deliberations are nothing less than objections to the jury system itself." (*Id.* at pp. 618-619.)

Motivated by these valid concerns, the court of appeals in *Thomas* adopted the rule announced in *Brown*: "We adopt the *Brown* rule as an appropriate limitation on a juror's dismissal *in any case* where the juror allegedly refuses to follow the law—whether the juror himself requests to be discharged from duty or, as in the instant case, fellow jurors raise allegations of this form of misconduct. Given the necessary limitations on a court's investigatory authority in cases involving a juror's alleged refusal to follow the law, a lower evidentiary standard could lead to the removal of jurors on the basis of their view of the sufficiency of the prosecution's evidence." (*U.S. v. Thomas, supra*, 116 F.3d 606, 622.)

The defendant in *U.S. v. Symington* (9th Cir. 1999) 195 F.3d 1080 was tried on a 23-count indictment that included charges of making false statements to financial institutions. On the eighth day of deliberations, following

a three-month trial, the court received a note from the jury indicating that " '[o]ne juror has stated their [*sic*] final opinion prior to review of all counts.' " (*Id.* at p. 1083.) The court sent back a note reminding the jury "of their duty to participate in deliberations with each other, but emphasizing also that each juror should make up his or her own mind on the charges." Several days later, the jury sent another note to the court indicating that one juror "cannot properly participate in the discussion" for the following stated reasons: "Inability to maintain a focus on the subject of discussion. [¶] Inability to recall topics under discussion. [¶] Refusal to discuss views with other jurors. [¶] All information must be repeated two to three times to be understood, discussed, or voted on. Immediately following a vote, the juror cannot tell us what was voted. [¶] We question the ability to comprehend and focus on the information discussed." The court questioned each juror individually. Every juror (except the one that was the subject of the complaint) stated that one juror, a woman who appeared to be in her mid-70's, "appeared confused and unfocused during deliberations" (*ibid.*), gave rambling answers to questions, and refused to explain her views, stating she did not "have to explain herself to anybody." (*Id.* at p. 1084.) The court of appeals noted: "The statements of some jurors indicated that their frustration with [the juror] may have derived more from their disagreement with her on the merits of the case, or at least from their dissatisfaction with her defense of her views." The juror "stated that she was prepared to continue deliberating. She noted that the other jurors' frustration with her might be because 'I can't agree with the majority all the time . . . .' " The court discharged the juror, "because she was 'either unwilling or unable to deliberate with her colleagues.' " (*Ibid.*)

The court of appeals in *Symington* echoed the concerns over the sanctity of jury deliberations expressed in *Brown* and *Thomas*. The court then stated its own version of the restrictive rules announced in *Brown* and *Thomas*: "We hold that if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." (*U.S. v. Symington, supra,* 195 F.3d 1080, 1087.) Applying this standard, the court reversed the judgment of conviction, concluding that "there was a reasonable possibility that [the juror]'s views on the merits of the case provided the impetus for her removal." (*Id.* at p. 1088.)

We agree with the observations in *Brown, Thomas,* and *Symington* that a court may not dismiss a juror during deliberations because that juror harbors doubts about the sufficiency of the prosecution's evidence. And the court in *Brown* is correct in observing that often the reasons for a request by a juror to be discharged, or the basis for an allegation that a juror refuses or is

unable to deliberate, initially will be unclear. We also agree, as noted above, that a court must take care in inquiring into the circumstances that give rise to a request that a juror be discharged, or an allegation that a juror is refusing to deliberate, lest the sanctity of jury deliberations too readily be undermined. But we do not adopt the standard promulgated in *Brown*, and refined in *Thomas* and *Symington*, that restricts a court's authority to inquire into whether a juror is unable or unwilling to deliberate and that precludes dismissal of such a juror whenever there is "any reasonable possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case." (*U.S. v. Symington, supra*, 195 F.3d 1080, 1087, italics omitted.) Rather, we adhere to established California law authorizing a trial court, if put on notice that a juror is not participating in deliberations, to conduct "whatever inquiry is reasonably necessary to determine" whether such grounds exist (*People v. Burgener, supra*, 41 Cal.3d 505, 520) and to discharge the juror if it appears as a "demonstrable reality" that the juror is unable or unwilling to deliberate. (*People v. Marshall, supra*, 13 Cal.4th 799, 843; *People v. Collins* (1976) 17 Cal.3d 687, 692 [131 Cal.Rptr. 217, 490 P.2d 537].)

■ Determining whether to discharge a juror because of the juror's conduct during deliberations is a delicate matter, especially when the alleged misconduct consists of statements made during deliberations. Evidence Code section 1150, while rendering evidence of the jurors' mental processes inadmissible, expressly permits, in the context of an inquiry into the validity of a verdict, the introduction of evidence of "statements made . . . within . . . the jury room." We have warned, however, that such evidence "must be admitted with caution," because "[s]tatements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors." (*In re Stankewitz* (1985) 40 Cal.3d 391, 398 [220 Cal.Rptr. 382, 708 P.2d 1260].) But statements made by jurors during deliberations are admissible under Evidence Code section 1150 when "the very making of the statement sought to be admitted would itself constitute misconduct." (40 Cal.3d at p. 398.)

We held in *People v. Hedgecock* (1990) 51 Cal.3d 395, 418 [272 Cal.Rptr. 803, 795 P.2d 1260] that jurors could be compelled to testify at a postverdict evidentiary hearing regarding allegations of juror misconduct, but observed that "to avoid a chilling effect on the jury's deliberations, a trial court may decline to require jurors to testify when the testimony will relate primarily to the *content* of the jury deliberations." We stated: "In rare circumstances a statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible. [Citation.] But when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's

mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150." (*Id.* at p. 419.)

█ Although the provisions of Evidence Code section 1150 apply only to the postverdict situation and not to an inquiry conducted during jury deliberations, the numerous decisions discussed above nonetheless support our conclusion that a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists. We also observe that permitting the attorneys for the parties to question deliberating jurors is fraught with peril and generally should not be · permitted. Of course, the court may allow counsel to suggest areas of inquiry or specific questions to be posed by the court.

As discussed above, proper grounds for removing a deliberating juror include refusal to deliberate. A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury. The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views. (See *People v. Castorena* (1996) 47 Cal.App.4th 1051, 1066-1067 [55 Cal.Rptr.2d 151].)

█ Applying these general principles to the circumstances of the present case, we conclude that the trial court abused its discretion in excusing Juror No. 1, because the record before us does not establish "as a demonstrable reality" that Juror No. 1 refused to deliberate. Although the jury's initial note

to the trial court asserted that Juror No. 1 "does not show a willingness to apply the law," it became apparent under questioning that the juror simply viewed the evidence differently from the way the rest of the jury viewed it. When asked to explain the assertion that Juror No. 1 was unwilling to apply the law, the foreperson explained that the juror "could not even agree that a crime had been committed" and believed there was not "any evidence to support that the defendant allegedly came in and was attempting to get the weapon that allegedly was behind the counter underneath the cash register." When asked whether Juror No. 1 had made up his mind prior to deliberations and was refusing to discuss the case, the foreperson responded: "I don't know if I could say that their [sic] mind was made up before we went into the room." The foreperson acknowledged that Juror No. 1 engaged in the deliberative process by listening to other jurors, although "halfheartedly," and by attempting to explain his views. His methods of analysis differed from those of his fellow jurors, and his approach to deliberations apparently frustrated his colleagues. The foreperson stated that Juror No. 1 refused to discuss the elements of attempted robbery individually, preferring to look at "the grand picture," from which he concluded that the evidence did not show defendant "was really after the gun."

The statements of the remaining jurors were similar. Although 10 jurors raised their hands when the court asked whether one or more jurors were not deliberating, individual questioning of the jurors revealed that it was the conclusion arrived at by Juror No. 1 that was at issue. The jurors complained that Juror No. 1 discussed matters that they considered "irrelevant" and adopted an "unreasonable interpretation" based upon "his own personal opinion," while "the rest of us have a different interpretation."

The trial court concluded that Juror No. 1 was "not functionally deliberating," because he refused to respond to "specific questions as to elements and facts" and, instead, relied upon "generalities." It is possible that Juror No. 1 employed faulty logic and reached an "incorrect" result, but it cannot properly be said that he refused to deliberate. Juror No. 1 participated in deliberations, attempting to explain, however inarticulately, the basis for his conclusion that the evidence was insufficient to prove an attempted robbery, and he listened, even if less than sympathetically, to the contrary views of his fellow jurors.

Under these circumstances, we conclude that the trial court abused its discretion in excusing Juror No. 1. This error is prejudicial and requires reversal of the judgment. (*People v. Hamilton* (1963) 60 Cal.2d 105, 128 [32 Cal.Rptr. 4, 383 P.2d 412], overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].)

## CONCLUSION

The judgment of the Court of Appeal is affirmed.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**WERDEGAR, J.**—I concur fully in the majority's decision to affirm the judgment of the Court of Appeal. I write separately to clarify the applicable legal standard appellate courts must apply when reviewing a trial court's decision to discharge, or not discharge, a sitting juror for failure or inability to deliberate. As the majority explains, Penal Code section 1089 authorizes a trial court to discharge a juror if, among other reasons, "good cause" is shown that the juror is "unable to perform his duty." We have on several occasions explained that a trial court's determination of good cause under section 1089 is subject to the deferential abuse-of-discretion standard, meaning that we will uphold the trial court's decision to discharge, or not discharge, a juror if there is substantial evidence supporting it. (See, e.g., *People v. Marshall* (1996) 13 Cal.4th 799, 843 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; *People v. Beeler* (1995) 9 Cal.4th 953, 975 [39 Cal.Rptr.2d 607, 891 P.2d 153]; *People v. Johnson* (1993) 6 Cal.4th 1, 21 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People v. Price* (1991) 1 Cal.4th 324, 400 [3 Cal.Rptr.2d 106, 821 P.2d 610].) However, if that were the extent of the appropriate appellate inquiry, we should reverse the Court of Appeal here, for there was substantial evidence, in the form of the testimony of several jurors, that Juror No. 1 was not functionally deliberating.[1]

Repetition of the "abuse of discretion" formula in this context is potentially misleading, for the substitution of a juror after the jury has retired to deliberate "may trench upon a defendant's right to trial by jury. (U.S. Const., Amend. VI; Cal. Const., art. I, § 16[.])" (*People v. Collins* (1976) 17 Cal.3d 687, 692 [131 Cal.Rptr. 782, 552 P.2d 742], fn. omitted.) Thus, discharge of a juror who may be holding out in a defendant's favor raises the specter of the government coercing a guilty verdict by infringing on an accused's constitutional right to a unanimous jury decision. In light of this constitutional dimension to the problem, it is inappropriate to commit to the trial court—subject only to the deferential abuse-of-discretion standard of review on appeal—the important question of the substitution of jurors after deliberations have begun.

---

[1]As the majority explains, both Juror No. 7 and Juror No. 9 stated that Juror No. 1 would not answer any questions. (Maj. opn., *ante*, at p. 472.) Juror No. 10 reported that Juror No. 1 did not participate when the other jurors discussed the elements of the offense. (*Ibid.*) Juror No. 11 testified Juror No. 1 refused to answer questions about his views whether the elements of the offense were shown by the evidence. (*Ibid.*) Juror No. 12 supported this latter observation. (*Id.* at p. 473.)

Recognizing the need for additional protection of an accused's constitutional rights, we more accurately have explained that, to affirm a trial court's decision to discharge a sitting juror, "[the] juror's inability to perform as a juror must 'appear in the record *as a demonstrable reality.*'" (*People v. Johnson, supra,* 6 Cal.4th at p. 21, italics added, quoting *People v. Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537]; *People v. Marshall, supra,* 13 Cal.4th at p. 843.) Such language indicates that a stronger evidentiary showing than mere substantial evidence is required to support a trial court's decision to discharge a sitting juror. In this context, then, a trial court would abuse its discretion if it discharged a sitting juror in the absence of evidence showing to a demonstrable reality that the juror failed or was unable to deliberate.

Because I read the majority opinion to be consistent with my understanding of the applicable standard of review, and because I agree the record does not show to a demonstrable reality that Juror No. 1 was refusing to deliberate with the other jurors, I concur.