Filed 10/2/14  P. v. Sims CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEON SIMS,<br><br>    Defendant and Appellant. | 2d Crim. No. B246691<br>(Super. Ct. No. TA123292)<br>(Los Angeles County) |

A jury found Deon Sims guilty of possession of cocaine base for sale (Health & Saf. Code, § 11351.5); sale, transportation or offer to sell a controlled substance (*id.*, § 11352, subd. (a)); and disobeying a gang injunction (Pen. Code, § 166, subd. (a)(4)).  The jury also found true as to each offense that Sims committed the offense for the benefit of, at the direction of or in association with a criminal street gang (*id.*, § 186.22, subds. (b)(1)(A) & (d)).

The trial court found Sims suffered one prior prison term (Pen. Code, § 667.5, subd. (b)) and two strikes (*id.*, §§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d)).  The court dismissed one strike and sentenced Sims to a term of 21 years.

On appeal, Sims contends the trial court erred in dismissing a juror and that his counsel was ineffective for failure to object to the scope of the court's jury inquiry.  We affirm.

FACTS

On May 21, 2012, at about 7:45 p.m., Los Angeles police officers Jonathan Vander Lee, Justin Chi and Manuel Moreno were in a marked patrol car in the Nickerson Garden Projects. The officers saw Sims speaking to an older African-American man. The men looked at the patrol car, immediately stepped back and began to walk away toward a courtyard behind a building.

Officers Chi and Vander Lee left the patrol car and walked to where they could see the men. They saw the older man hand Sims something. Sims put the object in his right pocket. Then Sims gave the older man something from his left hand. The officers formed the opinion that they had seen a drug transaction. There were no other people around.

The officers began walking toward the men. The men looked in the officers' direction. Vander Lee told them to stop. The older man put the object he had received from Sims in his mouth and began walking quickly southbound. Sims began running northbound. Vander Lee and Chi chased Sims.

While fleeing, Sims fell as he stepped off a curb. As he fell, he dropped a baggie he had been holding in his left hand. Vander Lee arrested Sims while Chi recovered the baggie. The baggie contained 30 pieces of rock cocaine and weighed 4.83 grams.

Detective Erik Shear testified as a narcotics expert. He said Sims possessed the drugs for sale.

### Gang Evidence

Sims is a member of the Bounty Hunter Bloods gang. The gang's color is red. At the time of Sims's arrest, he was wearing red pants, shoes and shoe laces. He had gang tattoos and had been served with a gang injunction. Among the gang's primary activities is selling rock cocaine. The gang has controlled rock cocaine sales in Nickerson Garden Projects for decades.

Drug sales benefit the gang by, among other things, providing the gang with money and allowing its members to subsist without legal employment. Without the necessity of legal employment, the gang members can be constantly on the street, creating fear in the community and allowing the gang to commit more crimes. Sims was subject to a gang injunction that he had previously violated.

*Defense*

Mary Jones and Britney Griffin were with Sims on May 21, 2012, at about 3:00 or 4:00 p.m. There was no older African-American man. Two police officers, one Asian and one Caucasian, approached the group. Sims began running and the officers chased him. Jones and Griffin followed. One of the officers brought Sims to the ground. He landed face first, hitting his head and rendering him unconscious. Sims had a large bump on his face. Sims did not drop anything when he fell. The officers searched Sims and recovered only a bag of marijuana, a cigar and some cash. Neither Jones nor Griffin knew whether Sims was a member of a gang.

Marisha Anderson is the mother of Sims's child. At about 3:00 or 4:00 p.m., on May 21, 2012, she saw Sims run through a parking lot at the front of her home. He was being chased by Chi and Vander Lee. Vander Lee kicked Sims to the ground and jumped on him, causing him to lose consciousness. Sims had a scrape on his face. Anderson did not see a bag of rock cocaine near Sims. Nor did she see the officers retrieve a bag of rock cocaine when they searched Sims. Anderson said Sims was not a member of the Bounty Hunter Bloods.

*Prosecution Rebuttal*

Officer Moreno took a photograph of Sims after his arrest. He did not have a scratch or bump on his head.

*Dismissal of Juror No. 10*

Juror No. 10 was one of the original jurors seated in the jury box. During defense counsel's jury voir dire, counsel asked whether jurors believe that

3

some police officers occasionally plant false or fake evidence on people. When defense counsel questioned Juror No. 10 he asked, "Have you ever known someone to allege that they had false evidence planted on." Juror No. 10 answered, "No." Defense counsel also asked the jurors whether the police sometimes lie in their police reports or in court. Juror No. 10 replied, "I believe it is possible."

The prosecutor asked whether anyone on the panel believed that police officers had a greater likelihood of lying. No juror indicated agreement. The prosecutor also informed the jury that it is a crime for an officer to lie in a report or to plant evidence. Finally, before the jury was chosen, the prosecutor said to the entire panel: "Anyone have any further questions? [¶] Since we're getting close to finding a jury, I think, just letting you know, these are the moments to talk and say if there's something else that has come up throughout this voir dire, this is the time to let us know. [¶] Both sides deserve a fair jury, and if there's something that may have been triggered in your mind throughout these conversations that you had with the lawyers and the judge, this is the time to do it. Let us know. Both sides deserve a fair trial." Juror No. 10 did not reply.

During deliberations the jury sent a note to the court asking whether a juror could be released for failure to deliberate. The court sent the bailiff to tell the jury to continue to deliberate until the attorneys could be called to discuss the matter. When the bailiff returned to the jury room, he found Jurors Nos. 6 and 10 screaming at each other. During the altercation, Juror No. 10 physically threatened Juror No. 6. The bailiff separated the jurors.

The court decided to question each juror separately. The court learned that Juror No. 3 was refusing to deliberate because she was afraid of retaliation from gangs. She asked the court to dismiss her, and the court ultimately did so. Sims does not contest the dismissal of Juror No. 3.

During the court's inquiry, Juror No. 8, the foreperson, said Juror No. 10 was also not deliberating. Juror No. 8 said Juror No. 10 only deliberated for the

4

first 10 minutes.  Juror No. 8 said that when "we talked about continuing to deliberate, Juror 10 was 'very closed down.'"  Juror No. 10 is basing his decision on factors outside the evidence.  "[Juror No. 10] said that he has been pulled over by the police and the police had told him that planting a gun on him would be very easy and he would go to jail for it and he would have no recourse."  When one juror asked to have the officers' testimony read back, Juror No. 10 said, "It's not going to matter."  No votes were taken on counts 1 and 2, but Juror No. 10 said, "I thought you guys were done," and was only willing to discuss count 3.

Juror No. 6 confirmed that Juror No. 10 "talked about being pulled over one time and [a] police officer flashed a handgun in front of him and told him 'see this is how easy I can set you up.'"

Juror No. 7 said that Juror No. 10 had made up his mind and said, "You're beating a dead horse.  I'm not going to change my mind."

Juror No. 9 said some jurors related personal stories that led them to conclude they could not believe the police officers.  Juror No. 12 said that some jurors were basing their opinions on personal experiences instead of the evidence.

Juror No. 10 told the court that the jury had reached a consensus on counts 1 and 2 before lunch.  But after lunch the foreperson made the jurors second-guess their decision.  Juror No. 10 said:  "I mean, when we heard -- when you told us to wait till we heard everything, that's what I did.  I didn't -- throughout this whole trial I didn't say one thing, and then when after I heard everything, I kind of made up my mind.  And this -- ever since I have been in there, it's like -- that's just how -- what I took from everything here.  And I can't -- I can't change.  To me it's just like I just can't change that way that I feel based on everything that I heard off of the stand."  Later, Juror No. 10 said that when he walked into the jury room, "I was undecided but I was leaning."

The court questioned Juror No. 8 again.  He said the jury had not reached a unanimous decision on counts 1 and 2.  The jury went on to discuss count

5

3 because Juror No. 10 said he had already decided on counts 1 and 2 and further discussion would not change his mind.

The court recalled Juror No. 10 and asked why he did not disclose his prior experience with the police during voir dire. Juror No. 10 replied that he was not asked. He said the incident with the police "wasn't nothing that was a huge deal."

When other jurors were recalled, they disputed Juror No. 10's assertion that he did not think his experience with the police was a "huge deal." They said Juror No. 10 referred to the incident as the reason he did not believe the police in this case. When one juror suggested Juror No. 10's experience had nothing to do with the case, Juror No. 10 replied, "[I]t has everything to do with what we're talking about."

The trial court acknowledged that Juror No. 10 was not directly asked whether he had any experience with the police planting false evidence. The court pointed out, however, that defense counsel asked the prospective jurors "over and over and over again" about the police planting false evidence. The court found he should have volunteered the information and he committed misconduct by not doing so.

The trial court also found that, although Juror No. 10 later modified his statement, he admitted his mind was made up before he entered into the jury room to deliberate. The court concluded Juror No. 10 refused to deliberate. The trial court dismissed Juror No. 10.

## DISCUSSION

### I.

Prior to trial, Sims moved for discovery of the files and records of Officers Vander Lee, Moreno and Chi pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. Sims sought evidence of misconduct reflecting on the officers' propensity for dishonesty or bias. The trial court granted the motion as to Vander

6

Lee and Moreno, but denied the motion as to Chi. Sims does not contest the denial of the motion as to Chi. The court reviewed the material in camera and found no discoverable information.

We have examined the record of the trial court's in camera review and have determined the trial court did not abuse its discretion. (*People v. Mooc* (2000) 26 Cal.4th 1216, 1229.)

II.

Sims contends the trial court erred in dismissing Juror No. 10.

The trial court may not dismiss a juror because the juror harbors doubts about the sufficiency of the prosecution's evidence. (*People v. Cleveland* (2001) 25 Cal.4th 466, 478.) But a juror who conceals relevant facts or gives false answers during the voir dire examination commits misconduct. (*In re Hitchings* (1963) 6 Cal.4th 97, 111.) Where the concealment is intentional bias may be implied justifying the juror's removal. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1175.) Where the concealment is unintentional, the question is whether the juror is sufficiently biased that he is unable to perform his duty. (*Ibid.*) The basis for the juror's disqualification must appear on the record as a "demonstrable reality." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) Under this standard we do not reweigh the evidence, but we must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied. (*Id.*, at p. 1053.)

Here there is more than ample evidence to support the trial court's conclusion that Juror No. 10 intentionally concealed his prior experience in which a police officer threatened to plant evidence. It is true, he was not directly asked whether a police officer ever threatened to plant evidence. But he was asked, "Have you ever known someone to allege that they had false evidence planted on?" At that time Juror No. 10 answered, "No." Anyone who did not intend to conceal information would have voluntarily disclosed an experience in which an officer

7

threatened to do just that. In addition, the questions to other jurors would have made it obvious that planting evidence would be an issue in the case. There is no reasonable possibility Juror No. 10 would believe the incident was insignificant.

Sims points out that after the first round of peremptory challenges the court told the jury, "Welcome to the newest members of our panel. For those of you that survived the first round of peremptory challenges, you can relax, sit back. My questions are only for the newest members of the panel, as well as the attorneys will only have an opportunity to question the newest members of the panel."

Even if Juror No. 10 took the court's statement to mean he no longer had to pay attention, Sims would not be helped. There had already been enough questions put to prospective jurors, including Juror No. 10, to elicit the appropriate disclosure. Had Juror No. 10 any doubt, the prosecutor expressly requested all prospective jurors to tell the court if anything said during voir dire raised any matter that should be disclosed.

As a separate basis for dismissing Juror No. 10, there is more than ample evidence to support the trial court's finding that the juror refused to deliberate. A juror's refusal to deliberate because he has made up his mind before deliberations began is a proper ground for a juror's removal. (*People v. Lomax* (2010) 49 Cal.4th 530, 589.) Juror No. 10 told the court, "When you told us to wait till we heard everything, that's what I did . . . . [A]fter I heard everything I kind of made up my mind. . . . I just can't change the way I feel based on everything I heard off of the stand." The court could reasonably interpret the statement to mean that he had made up his mind before he began deliberations. The court was not required to believe Juror No. 10 when he later modified his statement to say he was undecided but leaning. In fact, all the other jurors who spoke to the court on the matter confirmed that Juror No. 10 refused to deliberate. Juror No. 10 even told the court that the jury had reached a decision on counts 1 and 2. That was not true.

The trial court did not err in dismissing Juror No. 10.

8

## III.

Sims contends he was denied effective assistance of counsel when his counsel failed to properly object to the trial court's inquiry.

Sims argues that the permissible scope of the trial court's inquiry into the juror misconduct is limited solely to the allegations of misconduct. (Citing *People v. Cleveland*, *supra*, 25 Cal.4th at p. 485; *People v. Barnwell*, *supra*, 41 Cal.4th at p. 1054.) He claims that when the court asked the jurors whether they believed Juror No. 10 was using his past experience to decide the case, instead of the evidence, the court exceeded the limit of inquiry and invaded the deliberative process of the jury. Sims believes his counsel should have objected to the inquiry.

But the court's inquiry did not exceed its permissible scope or invade the jury's deliberative process. The need to protect the sanctity of jury deliberations does not preclude reasonable inquiry into allegations of misconduct. (*People v. Cleveland*, *supra*, 25 Cal.4th at p. 475.) The court is given broad discretion in deciding how to conduct the inquiry. (*People v. Clark* (2011) 52 Cal.4th 856, 971.)

Here the trial court was investigating three matters: Juror No. 3's refusal to deliberate due to her fear of gangs, an altercation in which Juror No. 10 physically threatened another juror, and Juror No. 10's refusal to deliberate. The court asked the jury foreperson whether the jurors were basing their discussions on the evidence or whether they were "bringing in any outside factors into their deliberations." The question about "outside factors" was reasonable in light of Juror No. 3's fear of gangs and an altercation between Juror Nos. 6 and 10 that went far beyond what usually attends a discussion of the evidence. The court's question led the jury foreperson to disclose that Juror No. 10 was not deliberating because of a previous experience he had with the police. The court did not dismiss Juror No. 10 because he was using his experience to evaluate the evidence. Instead, the court dismissed Juror No. 10 because he concealed his experience on voir dire and refused to deliberate.

9

Sims's counsel did not provide ineffective assistance.

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>


GILBERT, P. J.


We concur:


YEGAN, J.


PERREN, J.

Laura R. Walton, Judge

Superior Court County of Los Angeles
_____

Julia J. Spikes, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Roberta L. Davis, Deputy Attorney General, for Plaintiff and Respondent.