Filed 6/15/16  P. v. Lewis CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B261042 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA085380) |
| v. | |
| ALVINO RAY LEWIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark E.Windham, Judge.  Reversed and remanded.

Jerome J. Haig, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Alvino Ray Lewis was convicted, following a jury trial, of second degree robbery (Pen. Code, § 211)[1] and assault with a deadly weapon (§ 245, subd. (a)(1)). He was sentenced to 40 years to life. He argues on appeal that the trial court erred in discharging a juror during deliberations for refusal to deliberate and to follow the law. We agree and reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Events of September 28, 2013*

On the morning of September 28, 2013, Tritia Woo, an occupational therapist, entered a hospital break room at the Ronald Reagan Medical Center at UCLA. Inside the break room, she saw an African-American man without a badge or uniform. He said, " 'Good morning' " and Woo replied, " 'Hello.' " Woo then left the room and asked Demetrios Wilson, a physical therapist, if a new therapist had been hired as there was an unknown man in the break room. Wilson said no and went to investigate. As Wilson approached the break room, he saw defendant, a 58-year-old African-American man, walking out of the room with a "full" backpack.

Wilson asked defendant, " 'What were you doing in the staff room?' " Defendant replied that he was looking for the bathroom. Wilson then asked defendant to accompany him to security. Defendant initially agreed but then walked out of the building. Wilson followed him while " 'yelling' " and " 'screaming' " at bystanders to call the police. Defendant asked him, " 'Why are you hassling me?' " Defendant eventually offered to let Wilson look in his backpack. Wilson saw scrubs and a fleece that appeared identical to the uniforms worn at the medical center.

Witnesses diverged in their accounts of subsequent events. Wilson testified that he tackled defendant after defendant hit him in the head with a nail puller.[2] However, a

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.

[2]    A nail puller is "a device (as a bar with a notched end) for gripping and drawing a nail." (Merriam-Webster Dictionary <http://www.merriam-webster.com/dictionary/nail %20puller> [as of June 15, 2016].)

bystander testified that Wilson was "holding" defendant while defendant repeatedly pleaded, " 'Just let me go, man. Please just let me go.' " The bystander then saw defendant swinging a "metal rod" "as if to try to get away from" Wilson, after which Wilson "punched" defendant and "tackled him."

Wilson and defendant wrestled on the ground. Wilson testified he " 'choke[d]' " defendant, rendering him unconscious. Campus security arrived and asked Wilson to get off of defendant. Defendant revived and was taken to the hospital for medical treatment. He was charged with robbery and assault with a deadly weapon. The case was called for trial on August 21, 2014.

2. *Voir Dire*

Juror No. 12 was asked about his prior jury experience. He stated that he had been sworn as an alternate in a double murder case that resulted in a hung jury. He did not serve on the jury and did not have an opinion as to the outcome reached.

3. *The Removal of Juror No. 12 and the Guilty Verdict*

The presentation of evidence took place over three days and took approximately eight hours. Jury deliberations began at 9:05 a.m. on August 29, 2014. At 1:52 p.m., the court received a note from the jury panel stating, " 'What do we do when we're at a standstill? We've reviewed the law multiple times and can't make a unanimous decision?' " The court then instructed the jury to continue deliberations according to CALCRIM No. 3551: "Please consider the following suggestions: [¶] . . . Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors. [¶] It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict. . . ." At 2:14 p.m., the jury resumed deliberations.

At 3:26 p.m., the court received a second note from the jury. The note stated, " 'The entire jury is not at a standstill. There are eleven jurors who have all decided on a verdict. Only one juror refuses to have a discussion and share his opinion on the

3

evidence.  At this point it's contentious.  We don't see any way to take new approaches. He said he has done all the talking he's willing to, and it's gotten combative at times. Additional instructions will not lead us to open discussion.  He has no questions that require further validation.' "

The court brought the foreperson (Juror No. 10) into open court.  Juror No. 10 identified the holdout as Juror No. 12.  Juror No. 10 explained that Juror No. 12 "ha[d] formulated an opinion and sort of refuses to break down the evidence that's been brought forth . . . .  [¶] . . . [¶] . . . He's read the law, but he's refusing to discuss the law in relation to the evidence."  The court asked, "Is he arguing his point of view, in other words, the reason for his point of view?"  The foreperson responded, "No.  He's stating it and refusing to tell us why."

The court then individually questioned each of the others jurors outside the presence of the rest of the jury.

The court asked Juror No. 1, "Is there a juror who is not discussing his reasons?" Juror No. 1 replied yes, but then said that Juror No. 12 had "made [an] attempt to explain why his opinion is what it is."  Juror No. 1 stated that Juror No. 12's opinion was "not according to the law and not according to the instructions," but that Juror No. 12 had "give[n] a reason" and engaged in discussions up until the second note was submitted to the judge.  The court inquired, "So . . . after you came in here and I told you to think of new approaches[,] [a]t that point did he again—did he give you a reason for his point of view?"  Juror No. 1 replied, "Yes but hesitantly."  The court asked, "And did anybody respond to that with him?"  Juror No. 1 said, "Yes."  The court asked, "And did he reply?"  Juror No. 1 responded, "Sometimes.  [¶] . . . [¶] . . . He[] just repeat[s] himself."

Juror No. 2 reported that Juror No. 12 had "vaguely" "give[n] a reason for his point of view" and observed:  "I think his reason is his reason.  It's not what the evidence show[s] or, you know."  The court inquired, "At some point did this juror stop talking with the rest of you?"  Juror No. 2 replied, "Yeah.  He decided this is my choice, my decision, and that's it.  I'm not going to change it, and he stuck with it.  [¶] . . . [¶]  . . .

4

We've tried talking to him in different—putting it in different ways. He still insists on seeing it the way he wants to see it."

The court asked Juror No. 3 if Juror No. 12 had "ever deliberate[d] . . . with the group?" Juror No. 3 responded, "He's been difficult as far as he'll agree on some things, but he won't commit to making a decision. . . . [After the judge instructed the jury to deliberate further,] [¶] . . . [¶] . . . this person don't want to really talk about it at all [*sic*]. He don't want to say why they feel the way that they do [*sic*]."

The court asked Juror No. 4, "Does [Juror No. 12] acknowledge your point of view and respond to that point of view?" Juror No. 4 stated, "Yes. [¶] . . . [¶] . . . there is agreement about that point of view. But when asked if you agree with x, why not y, there will be no explanation. . . . There's just certain parts where—even if this person has agreed to everything else that we've said, even by their own account I agree with x y z, I still say this and I will not explain why I say this [*sic*]."

Juror No. 5 observed that Juror No. 12 "[i]s firm on his decision. And when we're asking him, I think—I think he's perceiving it as now we're pressuring him and wondering what we can do or what evidence we could [point to] to help him decide." The court asked Juror No. 5, "So you're all asking this one person what it would take him to decide? And so does he respond to those questions?" Juror No. 5 responded, "Yes." The court inquired, "Is he explaining his own point of view?" Juror No. 5 stated, "At points, yes. And at times, no."

The court asked Juror No. 6, "Has [Juror No. 12] ever deliberated with . . . everybody?" Juror No. 6 responded, "Oh, with everybody, yeah. He—he would say stuff but not like—he would like stop." The court inquired, "Is he explaining his point of view?" Juror No. 6 stated, "He tries to explain, but then he like gets frustrated, and he just stops."

The court asked Juror No. 7, "Has [Juror No. 12] deliberated with the group at all?" Juror No. 7 responded, "To an extent, yes. He sort of shut down. [¶] . . . [¶]. . . He's gotten to the point where he just doesn't want to talk . . . . [¶] He's in his mind made up his mind, and he doesn't want to deliberate, and he doesn't want to have any

5

more conversation about it. He says, 'You're not going to go change my mind. I'm not going to change my mind. I'm not going to talk about it anymore. It is what it is.' "

The court asked Juror No. 8, "At the beginning did [Juror No. 12] deliberate with the other jurors?" Juror No. 8 responded, "He didn't stand out at the beginning. But as we sorted—we started to reach a consensus—well, the rest of us started to reach a consensus, he got a bit quiet and then obviously you know, we started asking him what his thoughts were, and he would give very not detailed answers. [¶] You know, we [would] try—we'd ask him, 'Okay. You know, for this charge these are the points we have to look at. The instructions are very clear. These are the facts we have to establish, if these happened.' [¶] And we'd go through them one by one. And he'd be like, yeah—he would come to an answer[.] . . . Does that mean you have a belief in the charge—you know, a belief in the charge one way or another. And the answer to that would be incongruent with the parts themselves."

The court asked Juror No. 9, "Did [Juror No. 12] start out with deliberating with the group?" Juror No. 9 responded, "Ummm, yeah. I guess—he did." The court asked, "At some point he stopped?" Juror No. 9 said, "Yeah, he did. . . . [¶] . . . He won't discuss anything."

The court asked Juror No. 11, "Does [Juror No. 12] give [a] reason for his point of view?" Juror No. 11 responded, "Partial. Like this is why, and I'm not going any further." The court asked, "Did anything change when I gave you the instructions and I asked everybody to reconsider and try it different ways?" Juror No. 11 stated, "We started like reconsidering—you know, going over those—the law. Let's read it one more time. And hoping, you know, but I think the person has been change [*sic*]—because it's only one. So like we're not going to change his mind, no matter what we say. [He said,] [¶] . . . 'You're not going to change me. You know, this is where I stand.' So we're trying to negotiate different things, you know, us trying to bend and reconsider, you know. Can eleven bend, or can the one bend?" The court inquired, "But when you explain the reason for your point of view, can he explain or respond to why he might not

6

agree with that?" Juror No. 11 stated, "He agrees two is there, and there's another two, but that doesn't equal four."

The final juror questioned was Juror No. 12. The following colloquy ensued.

"The Court: Juror No. 12, I am not going to ask you about which way the jury is going. . . I want to follow up on what the foreperson has written. [¶] . . . [¶] So, Mr. Lewis, without telling me what you think of the evidence—Mr. Lewis—

"The Defendant: That's me.

"The Court: —is the defendant. He's present in the court. This is Juror No. 12. I looked down and saw the name. I'm sorry, sir. [¶] Has it gotten to a point where you're not talking to the jurors about reason[s]?

"Juror No. 12: I'm talking to the other jurors about reason[s]. Umm, every time I start talking, the confrontation came because I was being cut off by one of the other jurors. [¶] . . . [¶]

"The Court: . . . Are you discussing your point of view?

"Juror No. 12: Yes. I have been discussing my point of view up to that point when it was eleven against one.

"The Court: And is there something about that that's stopping you from explaining your point of view?

"Juror No. 12: Yes. Because every time I goes, one of them is cutting me off up until the heated argument started [*sic*]. [¶] . . . [¶]

"The Court: Have you been presented with points of view contrary to your own?

"Juror No. 12: Yes.

"The Court: And when you have heard that, have you responded to that either to acknowledge it or to refute it?

"Juror No. 12: Yes.

"The Court: And did you stop doing that at some point?

"Juror No. 12: Probably the last 15 minutes. [¶] . . . [¶]

"The Court: Is there any possibility that you would ever change your mind if given logical reasons for them or evidentiary reasons for that?

"Juror No. 12: From what I've heard in the jury room, no. [¶] . . . [¶]

"The Court: Are you unwilling to explain why you believe the others are wrong?

"Juror No. 12: No."

After Juror No. 12 left the courtroom, the prosecution argued that Juror No. 12 should be removed based on his "refusal to deliberate." Defense counsel pointed out that Juror No. 12 was "an African American male" and argued that "what we have is eleven people having an opinion one way and one person having an opinion another way. . . . [¶] . . . [¶] The court has instructed the jurors that they must view the evidence and apply the law individually and deliberate with the others. There's been no indication that Juror No. 12 has not done that. And at this point he feels that he's being bullied to chang[e] his opinion that he's expressed. When he tries to explain his opinion, he has 11 people interrupting him. [¶] . . . He has deliberated. And to remove him would deny my client a fair trial."

The following colloquy ensued:

The Court: "[Defense counsel] made reference to possible racial dynamics. And here the defendant, Mr. Lewis, is African-American, Juror No. 12 is African-American. And among the 11 jurors who agree that the defendant was engaging in this conduct were—

"[Defense counsel]: The defendant?

"The Court: —three African American jurors. They . . . agreed with the statement made by the foreperson. They all agreed and had . . . very similar explanations. [¶] . . . I don't think any of the 11 jurors were dishonest about what was actually happening in the room. [¶] It's interesting that during voir dire Juror No. 12 reported that during his prior jury service . . . the jury on which he served failed to reach a verdict in a double murder trial, and that this didn't bother him at all. . . . [I]n retrospect this could be to some extent evidence of a hidden agenda. [¶] Under *People* [*v.*] *Barnwell* (2007)] 41 Cal.4th 1038 [(*Barnwell*)], I can rely on such evidence to determine a juror's credibility. Now, here[,] whether he has an agenda, I think is speculation. . . . [¶] . . . [¶]

"[Defense counsel]: The court is correct, this juror did serve on a jury previously, a double homicide. However, he was an alternate. . . .

The court responded "Well, it's a good thing I didn't consider it." The court then delivered a lengthy oral ruling. We quote part of it: "Did this juror deliberate? . . . [T]alking about the evidence but never discussing the conclusion and failing to move

8

forward towards one verdict or another is not deliberating. [¶] . . . What's not permissible is [to refuse] to discuss the conclusion, to refuse to discuss the verdict, to refuse to apply the law to the facts, and that's what has been described by 11 jurors. That's what I believe happened. [¶] At some point Juror No. 12 stopped talking entirely by his own admission, and he claims this was just . . . the 15 minutes before I talked with them. [¶] And clearly he was lying about this as the juror's note had arrived much earlier in the afternoon . . . . [¶] Purportedly he agrees to the facts, he agrees to the law, but he will not apply the law to the facts, and that can't reasonably amount to deliberation. . . . One can't stop talking entirely merely because others disagree with him or even if they're contentious. . . .

"[H]is discussion doesn't proceed to the verdict itself, and that's a refusal to deliberate. I believe this juror pretended to deliberate, he was never open-minded, he never would have changed his mind, the only possible outcome for him would be for the others to agree with him. [¶] . . . [¶] And this is not a case where someone deliberates and then stops deliberating when others disagree with him as in *People v. Castorena*,[3] it does appear instead that this man came in here with an agenda. . . . [¶] . . . [¶] Also I'll note that failure to follow the law is juror misconduct under *Barnwell*[, *supra*,] 41 Cal.4th 1038, and [*People v.*] *Williams* [(2001)] 25 Cal.4th 441. [¶] In *Williams* a juror admitted this. Here instead more like *Barnwell* it's proved by the credible statements of 11 jurors. So on both grounds the People's motion to remove Juror No. 12 is granted."

Defense counsel again pointed out that Juror No. 12 had "served as an alternate on a hung jury[] [s]o to say that he had an agenda without pointing to one demonstrable piece of evidence to indicate that agenda, I think is improper." The court responded that

---

[3]     *People v. Castorena* (1996) 47 Cal.App.4th 1051 (holding the trial court abused its discretion when it removed a juror because the trial court "did not have the requisite facts upon which to decide whether [the discharged juror] in fact failed to carry out her duty as a juror to deliberate or whether the jury's inability to reach a verdict was due, instead, simply to [the removed juror's] legitimate disagreement with the other jurors.").

Juror No. 12 had been "pretending to deliberate without deliberating[] [a]nd the evidence of the agenda is just the inference I draw from these circumstances."

The court then excused Juror No. 12 over defendant's objection. The court seated an alternate juror and instructed the jury to begin its deliberations anew. One hour later, the jury found the defendant guilty as charged.

Defendant was sentenced to state prison for 40 years to life. He filed a timely notice of appeal.

## CONTENTION

Defendant contends the trial court removed Juror No. 12 without good cause.

## DISCUSSION

1.     *Applicable Law*

    a.     *Standard of Review*

" 'Trial by jury is an inviolate right and shall be secured to all . . . .' (Cal. Const., art. I, § 16.). . . . Among the essential elements of the right to trial by jury are the requirements that a jury in a felony prosecution consist of 12 persons and that its verdict be unanimous. [Citations.]" (*People v. Collins* (1976) 17 Cal.3d 687, 692–693.)

Section 1089 provides, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

"[T]he substitution of a juror after the jury has retired to deliberate 'may trench upon a defendant's right to trial by jury. [Citation.]' [Citation.] Thus, discharge of a juror who may be holding out in a defendant's favor raises the specter of the government coercing a guilty verdict by infringing on an accused's constitutional right to a unanimous jury decision. In light of this constitutional dimension to the problem, it is

10

inappropriate to commit to the trial court—subject only to the deferential abuse-of-discretion standard of review on appeal—the important question of the substitution of jurors after deliberations have begun." (*People v. Cleveland* (2001) 25 Cal.4th 466, 487 (*Cleveland*) (conc. opn. of Werdegar, J.).)

Thus, "[while] [w]e review for abuse of discretion the trial court's determination to discharge a juror and order an alternate to serve . . . [w]e also have stated . . . that a juror's inability to perform as a juror ' "must appear in the record as a demonstrable reality." ' [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 843.) "This standard 'indicates that a stronger evidentiary showing than mere substantial evidence is required to support a trial court's decision to discharge a sitting juror.' [Citation.]" (*Barnwell*, *supra*, 41 Cal.4th at p. 1052.) "To dispel any lingering uncertainty, we explicitly hold that the more stringent demonstrable reality standard is to be applied in review of juror removal cases. That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (*Id.* at p. 1052.)

"The demonstrable reality test entails a more comprehensive and less deferential review [than substantial evidence]. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [there was misconduct warranting dismissal of the juror]. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied. [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides." (*Barnwell*, *supra*, 41 Cal.4th at pp. 1052–1053.)

          b.     *A Juror May Be Discharged for Misconduct Including Failure to Deliberate*

Section 1089 has been applied "to permit the removal of a juror who refuses to deliberate, on the theory that such a juror is 'unable to perform his duty' within the

11

meaning of . . . [S]ection 1089. . . . [¶] . . . [¶] . . . [A] trial court, if put on notice that a juror is not participating in deliberations, [may] conduct 'whatever inquiry is reasonably necessary to determine' whether such grounds exist [citation] and to discharge the juror if it appears as a 'demonstrable reality' that the juror is unable or unwilling to deliberate. [Citations.]" (*Cleveland*, *supra*, 25 Cal.4th at pp. 475, 484.)

"A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury. The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views. [Citation.]" (*Cleveland*, *supra*, 25 Cal.4th at p. 475, 485.)

In *Cleveland*, after a two-day trial, the jury was instructed and retired to deliberate. On the second day of deliberations, the foreperson sent the trial judge the following note: " 'We request an alternate to replace one juror. One juror does not agree with the charge and does not show a willingness to apply the law. One juror will not abide the facts and apply the law. Please provide direction in this matter.' " (*Cleveland*, *supra*, 25 Cal.4th at p. 470.) The trial court questioned each juror individually, and then excused the juror and seated an alternate, observing that " 'I do find that [the excused juror] is not functionally deliberating . . . .' " (*Id.* at p. 473.)

12

The Court of Appeal reversed the ensuing conviction on the ground the dismissal of the holdout juror " 'violated [defendant's] right to a unanimous jury.' " (*Cleveland*, *supra*, 25 Cal.4th at p. 473.)  After granting review, the California Supreme Court affirmed the Court of Appeal, stating that "[a]lthough the jury's initial note to the trial court asserted that [the excused juror] 'does not show a willingness to apply the law,' it became apparent under questioning that the juror simply viewed the evidence differently from the way the rest of the jury viewed it. . . .  [¶]  [I]ndividual questioning of the jurors revealed that it was the conclusion arrived at by Juror No. 1 that was at issue. . . .  [¶] . . . It is possible that [the excused juror] employed faulty logic and reached an 'incorrect' result, but it cannot properly be said that he refused to deliberate.  [He] participated in deliberations, attempting to explain, however inarticulately, the basis for his conclusion that the evidence was insufficient to prove an attempted robbery, and he listened, even if less than sympathetically, to the contrary views of his fellow jurors." (*Id.* at pp. 485-486.)

In *People v. Thomas* (1994) 26 Cal.App.4th 1328, by contrast, the Court of Appeal upheld the dismissal of a juror who refused to deliberate.  The court stated " 'The juror did not answer the questions posed to him by other jurors, did not sit at the table with the other jurors during deliberations, acted as if he had already made up his mind before hearing the whole case, and did not look at the two victims in the courtroom.  As the court concluded, Juror Bailey "made up his mind before he went in there." ' [Citation.]" (*Cleveland*, *supra*, 25 Cal.4th at p. 475, citing *People v. Thomas*, *supra*, 26 Cal.App.4th at p. 1333.)

c.       *Refusal to Apply the Law is Also Jury Misconduct*

"A juror who refuses to follow the court's instructions is 'unable to perform his duty' within the meaning of . . . [S]ection 1089." (*People v. Williams* (2001) 25 Cal.4th 441, 448; *see People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1445, fn. 2 [trial court is "duty bound" to discharge a juror who is unable to follow the law]; *People v. Williams* (1996) 46 Cal.App.4th 1767, 1780–1781 [juror properly discharged for "not following the law"].)

13

In *People v. Williams* (2001) 25 Cal.4th 441, the Supreme Court affirmed the Court of Appeal's holding that the trial court did not abuse its discretion in discharging a juror who refused to follow the law. "The juror stated that he objected to the [relevant] law . . . and expressly confirmed that he was unwilling to abide by his oath to follow the court's instructions. The juror's inability to perform his duties thus appears in the record ' " 'as a demonstrable reality.' " ' [Citation.]" (*Id.* at p. 461.)

2. *No "Demonstrable Reality" That Juror No. 12 Refused to Deliberate or Failed to Follow the Law*

Applying these principles to the circumstances of the present case, we conclude the trial court abused its discretion in excusing Juror No. 12 because the record does not establish "as a demonstrable reality" that Juror No. 12 refused to deliberate or failed to follow the law.

The trial court cited several reasons in support of its decision to remove Juror No. 12: Juror No. 12 (1) "talk[ed] about the evidence but never discuss[ed] the conclusion," (2) "stop[ped] talking entirely merely because others disagree[d] with him;" (3) "came in here with an agenda;" and (4) "refuse[d] to apply the law to the facts." We address each of the court's stated reasons for dismissing the juror in turn.

a. *The Evidence Did Not "Manifestly Support" the Conclusion That Juror No. 12 Refused to "Discuss [His] Conclusion"*

With respect to the court's first stated reason—that Juror No. 12 never discussed his "conclusion"—several jurors made ambiguous comments about whether Juror No. 12 had reached a decision and discussed it with the rest of the jury. Although the foreperson's second note stated that Juror No. 12 had not "share[d] his opinion on the evidence"—which could be construed to mean Juror No. 12 had not discussed his conclusion—when the court questioned the foreperson, the foreperson said "[Juror No. 12] has formulated an opinion" and "state[d] his point of view."

Juror No. 5 said "we're all taking turns asking" Juror No. 12 "what evidence we could do to help him decide." However, Juror No. 5 also said Juror No. 12 is "firm on his decision." The court asked Jurors Nos. 6 and 7 whether the foreperson was "correct"

14

when he wrote " 'one juror refuses to share his opinion on the evidence.' " Both jurors answered yes. However, when the court asked Juror No. 6 whether Juror No. 12 "[is] . . . explaining why he is voting *the way he is voting*," Juror No. 6 said "he tries to explain." Juror No. 7 also said that Juror No. 12 had "made up his mind.

Only Juror No. 3 unambiguously stated that Juror No. 12 would not "commit to making a decision."

None of the other jurors stated that Juror No. 12 had failed to reach a conclusion based on the evidence. On the contrary, many of these jurors made clear that the problem was that Juror No. 12 had reached a conclusion that was at odds with the conclusion reached by the other members of the jury. (Juror No. 2: "[H]is reason is his reason. It's not what the evidence show[s]. . . . [¶] . . . [¶] . . . He still insists on seeing it the way he wants to see it"; Juror No. 5: "He's firm on his decision. And when we're asking him, I think . . . he's perceiving it as now we're pressuring him"; Juror No. 7: "He's in his mind made up his mind . . . . He says, 'you're not going to change my mind' "; Juror No. 8: " We'd ask him, 'Okay. You know, for this charge these are the points we have to look at . . . . These are the facts we have to establish, if these happened.' [¶] And we'd go through them one by one. . . . He would come to an answer . . . [a]nd the answer to that would be incongruent with the parts themselves"; Juror No. 11: "I think the person has been change [*sic*]—because it's only one. So like we're not going to change his mind, no matter what we say. . . . [¶] [He said,] 'You're not going to change me. You know, this is where I stand.' . . . Can eleven bend, or can the one bend?"; Juror No 12: "I have been discussing my point of view up to that point when it was eleven against one.")

The trial court did not attempt to resolve the ambiguities within individual jurors' statements or among the jurors; nor did the trial court indicate that it found some jurors credible over other jurors. Rather, the trial court stated it found credible all the jurors except Juror No. 12, and that the 11 jurors had "very similar explanations."

"Under the demonstrable reality standard, . . . the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Barnwell*, *supra*, 41 Cal.4th at p. 1053.) Here, the trial court

15

relied on all 11 jurors' statements to support its conclusion that Juror No. 12 had not discussed his conclusions with the other members of the jury. The evidence does not "manifestly support" that conclusion. Rather, other than Juror No. 3's statement, the other jurors' statements were ambiguous on this point or supported a contrary conclusion.

In addition, as in *Cleveland*, it was clear from the beginning of discussion with jurors that Juror No. 12 was a holdout. (See also *People v. Karapetyan* (2003) 106 Cal.App.4th 609, 621 [holding the trial court erred in discharging a juror for failure to deliberate where "[t]he real problem, which should have been apparent to everyone in the courtroom, was that . . . the jury was deadlocked at 11 to one for guilt"].) The foreperson's first note indicated the jury was deadlocked and could not come to a unanimous decision. The second note revealed that 11 jurors had "decided on a verdict" and only one juror was at odds. Even the trial court acknowledged that Juror No. 12 had a different view than the other jurors. (The court asked Juror No. 12: "Are you unwilling to explain *why you believe the others are wrong*?") Here, it was apparent from many of the jurors' comments that the "real problem" was Juror No. 12's refusal to "bend" and conform to the decision of the 11 other jurors. As set forth in *Cleveland*, " 'a court may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence,' . . . otherwise 'the right to a unanimous verdict would be illusory.' [Citation.]" (*Cleveland*, *supra*, 25 Cal.4th at p. 481.)

The complaints made by the jurors here were similar to those in *Cleveland*. As in *Cleveland*, most of the jurors in this case "acknowledged that [the removed juror] engaged in a deliberative process by listening to other jurors, although 'halfheartedly,' and by attempting to explain his views. His methods of analysis differed from those of his fellow jurors, and his approach to deliberations apparently frustrated his colleagues. . . . [¶] . . . [¶] . . . It is possible that [the removed juror] employed faulty logic and reached an 'incorrect' result, but it cannot properly be said that he refused to deliberate. [He] participated in deliberations, attempting to explain, however inarticulately, the basis for his conclusion . . . and he listened, even if less than

16

sympathetically, to the contrary views of his fellow jurors." (*Cleveland*, *supra*, 25 Cal.4th at p. 486.) As in *Cleveland*, such statements did not show "as a 'demonstrable reality' " (*id.* at p. 484) that Juror No. 12 "talk[ed] about the evidence but never discuss[ed] the conclusion" or that he refused to deliberate.

b.       *Juror No. 12's Decision Not to Participate in Further Discussions Was Permissible*

The trial court also cited Juror No. 12's decision to "stop talking entirely merely because others disagree[d] with him" as support for the conclusion that Juror No. 12 refused to deliberate. The Supreme Court stated in *Cleveland* that "[a] juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.) Therefore, the issue is whether Juror No. 12 participated in deliberations for a reasonable period of time before he stopped talking based on the belief that further discussion would not alter his views.

The presentation of evidence took approximately eight hours. The jury deliberated over three hours before sending the court the first note. The jurors all affirmed that Juror No. 12 participated to some degree in deliberations. In addition, the majority of jurors said that Juror No. 12 stopped talking at a certain point. Juror No. 1 said Juror No. 12 stopped talking after the foreperson gave the second note to the court. Juror No. 3 said that Juror No. 12 stopped talking after the judge further instructed the jury. Juror No. 5 said Juror No. 12 stopped talking "at the end." Juror No. 12 said he stopped participating in discussion "the last 15 minutes"; however, the court found this statement not credible and did not rely on it. None of the other jurors specified when Juror No. 12 stopped talking.

Three jurors also said that Juror No. 12 stopped talking because he concluded that further discussion would not alter his views—he had "made up his mind," he "decided this is my choice, my decision and that's it," and " 'you're not going to change me.' " No

17

juror suggested that Juror No. 12 had a different motivation for refusing to participate in further discussion.

Based on the testimony of the 11 jurors the court found credible, the record indicates that Juror No. 12 stopped participating in discussions sometime after the judge further instructed the jury; in other words, "at the end" of the several hours during which the jury deliberated. In addition, the record is consistent that Juror No. 12 stopped talking based on the belief that further discussion would not alter his views. Given that the presentation of evidence only lasted eight hours and the other 11 jurors had decided on a verdict during the three hours before Juror No. 12 stopped talking, we conclude the record does not reflect a demonstrable reality that Juror No. 12 did not participate in deliberations for a reasonable period of time before he "made up his mind" and refused to further discuss matters with the jury.

   c.   *The Trial Court's Finding That Juror No. 12 Had an "Agenda"*
        *Erroneously "Presum[ed] the Worst" of Juror No. 12*

In *People v. Compton* (1971) 6 Cal.3d 55, Justice Mosk wrote that "an inability to perform the functions of a juror . . . must appear in the record as a demonstrable reality. Here the ambiguity in [the juror's] remarks was never resolved by proof, and the court was not entitled to do so by presuming the worst. Such a presumption, however well motivated, does not furnish the 'good cause' required by the governing statutes." (*Id.* at p. 60.)

Here, the trial court concluded Juror No. 12 should be discharged because, inter alia, he "came in here with an agenda." The court did not explain what that purported agenda was—but it appears the court believed Juror No. 12 intended, for some reason, to sabotage jury deliberations. The court first presumed Juror No. 12 had a "hidden agenda" based on the fact that he had held out for an acquittal when serving as a juror in a prior case. When defense counsel pointed out that Juror No. 12 had only acted as an alternate in the prior case the court continued to conclude that Juror No. 12 had an agenda, but based this conclusion on an "inference" drawn from Juror No. 12's having "pretend[ed] to deliberate." In doing so, the trial court erroneously "presumed the worst" of Juror

18

No. 12. None of the jurors' comments suggested that Juror No. 12 came into deliberations with some kind of agenda. Furthermore, as explained above, the evidence did not support the judge's conclusion that Juror No. 12 failed to deliberate; therefore, any inference drawn from that conclusion is also unsupported by the evidence. On these grounds, the court's presumption that Juror No. 12 harbored an agenda did not support the "good cause" required to discharge a juror.

### d. The Evidence Did Not "Manifestly Support" the Conclusion That Juror No. 12 Failed to Apply the Law

The court's secondary ground for removing Juror No. 12 was his "failure to follow the law." The court found that Juror No. 12 "refuse[d] to apply the law to the facts[—] that's what has been described by 11 jurors [and] [t]hat's what I believe happened." However, only two jurors addressed this issue in any fashion: the foreperson and Juror No. 1.

Upon being questioned by the court, the foreperson said that Juror No. 12 "refus[ed] to discuss the law in relation to the evidence." However, while the foreperson's comment suggests that Juror No. 12 refused to "discuss" how the law applied to the facts, it does not indicate that Juror No. 12 utterly failed to apply the law to the facts.

Juror No. 1 stated that Juror No. 12 had tried to explain the reasons for his opinion "but [his opinion] [i]s not according to the law and not according to the instructions." However, that comment is ambiguous. It could indicate either that Juror No. 12 deliberately reached a conclusion contrary to the law, or that Juror No. 12 incorrectly applied the law—which *Cleveland* states is not a valid ground for removal. (See *Cleveland*, *supra*, 25 Cal.4th at p. 485 ["The circumstance that a juror . . . relies upon faulty logic or analysis . . . is not a ground for discharge."].)

While the court questioned each juror about whether Juror No. 12 had participated adequately in deliberations, the court did not ask the jurors whether Juror No. 12 had refused to apply the law to the facts or failed to follow the law. As the great majority of the jurors did not address the issue, and the two jurors that did address the issue did not

set forth a clear view that Juror No. 12 refused to follow the law, the record does not reflect a demonstrable reality in support of this conclusion.

3. *The Judgment Must Be Reversed*

As the record does not establish as a "demonstrable reality" that Juror No. 12 failed to deliberate or refused to follow the law, the trial court abused its discretion in discharging Juror No. 12. This error is prejudicial and requires reversal of the judgment. (See *Cleveland*, *supra*, 25 Cal.4th at p. 486, citing *People v. Hamilton*, *supra*, 60 Cal.2d at p. 128 [holding that "if the record shows . . . that, based on the evidence, [a removed juror] was inclined toward one side, the error in removing such a juror would be prejudicial to that side."]; *People v. Delamora* (1996) 48 Cal.App.4th 1850, 1856 [error in removing jurors was prejudicial where the jury was deadlocked prior to removal but quickly reached verdict to convict after substitution with alternate jurors].)

## DISPOSITION

The judgment is reversed and the matter remanded for a new trial.


## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


EDMON, P. J.


We concur:



ALDRICH, J.                                    HOGUE, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20