Filed 7/9/21  P. v. Kalamkarian CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B305996 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. PA090643 |
| HAROUTIOUN KALAMKARIAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Terrell, Judge.  Affirmed.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Stacy S. Schwartz and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

A jury convicted defendant and appellant Haroutioun Kalamkarian of two counts of lewd act on a child under the age of 14.  On appeal, Kalamkarian's sole contention is the trial court violated his constitutional rights by declining to remove a juror and replace her with an alternate.  We find no abuse of discretion and affirm.

### FACTS AND PROCEDURAL BACKGROUND

**1.**      ***Kalamkarian molests Vana B. for three months***

As Kalamkarian does not challenge the sufficiency of the evidence, we summarize it briefly.  In August 2014, Vana B. was 10 years old and in the fifth grade.  Her brother Hovag was in the sixth grade.  On August 14, 2014, Kalamkarian, who was "a family friend" of Vana's father, began picking up Vana and Hovag from school.

Kalamkarian picked Vana up when she got out of school at 2:30 p.m.  He took her to a lemon tree near Hovag's school. (Hovag got out of school at 3:00 p.m.)  One day that first week, Kalamkarian asked Vana "if [she] wanted to pick lemons for [her] grandma."  When Kalamkarian lifted Vana up to get lemons, he "scoop[ed]" her up from her bottom, put his whole left hand on her vagina, and "squeeze[ed]" and "massag[ed]" it.  Vana felt "[v]ery uncomfortable."

On another day, Kalamkarian leaned against the passenger side of his car, told Vana to stand in front of him, "pulled [her] in," "put his hands on [her] butt" outside her clothes, and squeezed and massaged it with both hands.

Another time Kalamkarian made Vana lean up against him, put his hands on her breasts under her tank top, and cupped, massaged, squeezed, and "play[ed] with them."  While he did this, Vana "felt like a hard object where his penis would be"; he "was grinding it on [her] butt."  Vana was "very shocked and uncomfortable, but [she] was too afraid to say anything."

2

On yet another date, when Vana refused to get out of the car to "pick lemons," Kalamkarian got into the back seat, closed the door, sat "right next to [her]," "and put his hands skin-to-skin on [her] vagina." He "open[ed] up the labia majora" and "fe[lt] around."

After the first week, Kalamkarian touched Vana "almost every day." "It was continuous, and it really did not have a pattern."

On October 13, 2014, Deborah Lee was driving down the street around 3:00 p.m. She saw a car "where [an] older man was leaning up against the back—with his back to the car with [a] little girl leaning up against him in front of him with his arms around her and his hands on her breasts." Lee "didn't feel right about it"—"[h]e was touching her in a place that seemed to [her] was wrong, and she looked a little scared." Lee made a U-turn, parked, and got out. Lee told Kalamkarian "what he was doing to her . . . was not right" and she "was going to call the cops."

Kalamkarian told Vana to get back in the car. He said, " 'Don't mind her. People in America are just crazy. She's a lunatic. Don't tell anyone.' " Lee followed Kalamkarian's car, called 911, and gave the operator Kalamkarian's license plate number.

About a month later, police came to Vana's house. Vana "tried to sit [her] mom down and talk to her about it and then [she] just couldn't bring [herself] to do it." Vana told her mother Kalamkarian touched her vagina when they were picking lemons. Vana's mother wanted to make a police report but her father disagreed, saying Kalamkarian was a trusted friend.

In 2017 Vana started seeing a therapist because she was cutting herself. Vana told her therapist what Kalamkarian had done to her, and the therapist called the police. A detective came to talk to Vana, and she told him what had happened.

3

## 2. *The trial and Juror No. 9*

The People charged Kalamkarian with two counts of lewd act on a child in violation of Penal Code section 288, subdivision (a). The case went to trial in February 2020.

### a. *Voir dire*

The trial court gave the prospective jurors questionnaires to complete and then questioned them, as did counsel. Kalamkarian's appellate counsel moved to augment the record on appeal to include the jury questionnaires, but the superior court stated it could not find them. According to the reporter's transcript, one of the questions on the questionnaire was, "Do you have any feelings about the particular charge, lewd act upon a child, against this defendant that would make it difficult for you to be a fair and impartial juror in this case?" A number of prospective jurors told the court and counsel they, or someone close to them, had been the victim of child molestation. The court handled these colloquies in chambers.

The juror who eventually became Juror No. 9 was single with no children; she worked as a registered nurse. Juror No. 9 said that, when she was about eight to 10 years old, her stepfather would come into the room she shared with her sister "and pull down our pants when we were sleeping." Her sister told her "he would put her on his lap when he had a boner . . . ." The man remained in the household for "five plus years." Juror No. 9 reported the behavior to her mom after she and the man divorced, but the police did not get involved.

The court told Juror No. 9, "Obviously, that's not something you'll ever forget for the rest of your life." The juror answered, "Uh-huh." The court continued, "The question for us, though, is not whether you can forget it, but if you can put it aside so when the evidence comes in in this case, you can make a decision based on the evidence presented in this case and not based on your own

4

experience or your sister's experience and the traumatic events that you've endured when you were children." Juror No. 9 responded, "I am – I am pretty sure I'm able to detach myself from that, from those experiences."

Defense counsel then asked Juror No. 9 if she could "keep an open mind, listen to . . . the totality of the evidence and then be able to be fair and impartial and make a decision based on the credibility of the witnesses and the evidence that you . . . evaluated," given the alleged victim was "around the same age." Juror No. 9 again responded, "I am pretty sure I can detach myself and listen to the whole story." Defense counsel followed up, noting the juror had said "pretty sure." The juror then said, "Yes. Okay. Then let me rephrase it. I am and will be able to cut myself off from that trauma and be able to keep an open mind when it comes to this case."

Defense counsel did not challenge Juror No. 9 for cause, nor did he exercise a peremptory challenge to remove her.[1]

### b.    *Juror No. 9 sends a note to the judge*

Vana was the first witness to testify. When the trial recessed for lunch, Juror No. 9 "left a note." In chambers, the court showed the note to counsel and read it into the record. Juror No. 9 had written, "May I speak to the judge regarding being excused from this case? I honestly thought I could be impartial in this case and separate my past experiences, but what the witness stated[,] I remembered a lot about what I . . . also experienced. The rubbing of the body on the pelvic area, being afraid, etc."

---

[1]    Accordingly, appellate counsel's musing that "it is surprising Juror No. 9 was seated after voir dire when she disclosed her personal history involving the same crime she would be asked to judge" is irrelevant.

5

Defense counsel recalled the in-chambers conversation with the juror during voir dire, and said, "Obviously, this has triggered something, and I – based on this note, I don't think that she would be able to continue as a juror on this case." The court replied, "[I]t seems a bit premature now. . . . [W]e can reexamine this at the end of the evidence . . . . What we need to know at the end of the day is whether she's able to listen to everything and keep an open mind. She doesn't know that right now." After further discussion with counsel, the court stated, "She's already on the jury. It seems to me that we could ask her that question [—can she evaluate the case based on what's presented in the courtroom without impact from her life experience—] after all the evidence is in . . . . So that's my suggestion, which is not to definitively say she stays on the jury, but let's make that call with more complete information at the end of the presentation of evidence." Defense counsel said, "Okay. . . . All right. Thank you."

Back in the courtroom, the court told the jurors, "Juror No. 9 . . . wrote a note to the court, which I discussed with both attorneys. We will revisit that issue once all the evidence is in. I need you to listen to all the evidence and then we'll revisit that issue."

At the conclusion of the evidence, the court spoke with Juror No. 9 in chambers, with counsel present. The court asked, "The concerns you expressed in the note, do you have those concerns still?" Juror No. 9 responded, "I did not expect the first witness to be so emotionally charged." The court interrupted to caution the juror not to discuss the strength of the evidence or her opinions about the credibility of any witness. The court said, "I just want to know whether your concerns about being able to serve . . . are still there or whether you feel that . . . now that

6

you've heard all the evidence, that you can continue your service?"

Juror No. 9 responded, "Hearing the rest of the evidence, I don't think my concerns are still there." The court asked, "Do you think you can be fair, you can be impartial?" The juror said, "Hold on. Let me think about it." The court continued, "Let me ask it another way. Do you think you can judge this case based only on the evidence that was presented in the courtroom?" Juror No. 9 answered, "Hearing all the evidence, I believe I can."

The court then said, "As I said during the jury deliberation [*sic*] process, that's what the court requires of all jurors, that they make a decision only on the evidence and only after considering all of the evidence and deciding whatever credibility decision you're going to make based on the totality of the evidence. Are you confident you can do that?" Juror No. 9 answered, "Sorry. I'm just – yes."

Defense counsel then asked the juror, "Despite your own personal feelings, do you think you can remain fair and impartial in this case?" Juror No. 9 responded, "I think I can, but I can see --." Defense counsel interrupted: "I sense that there are some doubts so --." The court said, "That's all you need to say." The juror said, "Okay."

The prosecutor asked Juror No. 9, "Bottom line, you can base your decision on the evidence in this case?" The juror asked, "Solely on the evidence?" The prosecutor said, "Yes." Juror No. 9 answered, "Yes."

After the juror left the chambers, defense counsel asked the court to replace her. Counsel said,

> "As the court observed, she took some time
> to respond to the questions, and part of that is
> she's trying to stay within the boundaries that
> Your Honor had given her, and I understand

7

that. But her responses were 'I think I can,' did not give the notion that 'yes, I can.' She was hesitant. She was concerned. So on that basis, I would ask that she be replaced . . . ."

The prosecutor disagreed.

The court stated, "I did not sense any ambiguity. She was clear she can do this based on the evidence and do it fairly, do it impartially. So I'm going to deny the defense request that she be excused for cause."

### c.    *The verdicts and sentence*

The jury convicted Kalamkarian on both counts. The court sentenced him to 10 years in the state prison, choosing the upper term of eight years on count 1 and one-third the midterm of two years on count 2.

### DISCUSSION

Kalamkarian's sole contention on appeal is that the trial court violated his constitutional rights by declining to remove Juror No. 9. Kalamkarian asserts that, in light of what happened with her stepfather when she was a child, "Juror No. 9, at some level, inevitably would want to punish Kalamkarian despite her assurances to the trial court she would decide the case based on the evidence."

Penal Code section 1089 (section 1089) authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is found to be unable to perform his or her duty. A trial court has broad discretion to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve. (*People v. Bennett* (2009) 45 Cal.4th 577, 621 (*Bennett*); *People v. Millwee* (1998) 18 Cal.4th 96, 142, fn. 19.)

8

The ultimate decision whether to retain or discharge a juror rests in the sound discretion of the trial court. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 486 (*Sattiewhite*).) We review a trial court's determination of whether a juror should be discharged for good cause under an abuse of discretion standard. (*People v. Beeler* (1995) 9 Cal.4th 953, 989 (*Beeler*); *Bennett, supra*, 45 Cal.4th at p. 621.) If any substantial evidence exists to support the trial court's exercise of its discretion under section 1089, the court's action will be upheld on appeal. (*Sattiewhite*, at p. 486.)

"Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence." (*People v. Holt* (1997) 15 Cal.4th 619, 659. See also *Sattiewhite, supra,* 59 Cal.4th at p. 486; *Bennett, supra*, 45 Cal.4th at p. 621; *People v. Lucas* (1995) 12 Cal.4th 415, 489.) We defer to the trial court's credibility assessments, based, as they are, on firsthand observations unavailable to us on appeal. (*People v. Williams* (2015) 61 Cal.4th 1244, 1262; *Beeler, supra,* 9 Cal.4th at p. 989 [trial court was in best position to observe juror's demeanor].)

Here, during voir dire, Juror No. 9 told the judge and the attorneys about her experience with her stepfather.[2] Juror No. 9

---

[2]    Kalamkarian's reliance on *People v. Diaz* (1984) 152 Cal.App.3d 926 is misplaced. There, a juror concealed during voir dire that she had been the victim of a crime similar to that charged against the defendant. The court discussed the presumption of prejudice arising from juror misconduct. (*Id.* at p. 930.) Here, by contrast, Juror No. 9 did not conceal—but

stated she could "cut [her]self off from that trauma and be able to keep an open mind when it comes to this case." After hearing the first part of Vana's testimony,[3] Juror No. 9 wrote the court a note just before the lunch break. The court's "suggestion" to counsel was they hold further investigation of the issue until the evidence was in, when the court and counsel would have "more complete information."

When both sides were about to rest, the judge again brought Juror No. 9 into chambers. By then, the jury had heard the direct and cross-examination of Vana, as well as the testimony of Deborah Lee (who had driven by and seen Kalamkarian touching Vana's breasts) and Joyce Medley, an expert in Child Sexual Abuse Accommodation Syndrome. The jury also heard testimony from defense witnesses: Kalamkarian's son Raffi and Raffi's wife Talin Jorian.

Juror No. 9 said she had not "expect[ed] the first witness [Vana] to be so emotionally charged." Vana was 15 at the time of trial. She described Kalamkarian's actions in her testimony and also demonstrated what he had done to her using a mannequin. At one point, describing how Kalamkarian had cupped and squeezed her breasts, Vana began to cry. Later in her testimony, describing how her father refused to make a police report and she felt "alone in the situation," Vana began to cry again.

---

rather readily disclosed—her experience with her stepfather as a child. Juror No. 9 did not engage in any misconduct.

[3] Trial began that morning at 10:11 a.m. The court gave the jury the introductory instructions and counsel presented opening statements. Of the 77 pages of reporter's transcript that morning, about 65 percent (50 pages) are of Vana's testimony. Accordingly, the jury heard from her for about an hour and 10 minutes before breaking for lunch.

This testimony undoubtedly was emotional and perhaps difficult for the jurors to hear. There is no indication Vana became tearful again on cross-examination, redirect, or recross. Kalamkarian's son then told the jury he was a "very good, loving, caring husband, father, and grandfather" who "[a]bsolutely [could] not" "do the things that they are saying he did." Kalamkarian's daughter-in-law testified he was "a very caring, very welcoming, very warm person" and she had no hesitation in leaving her young daughter in his care.

Having heard all the evidence, Juror No. 9 told the judge and counsel she "[didn't] think [her] concerns"—expressed in her note—"[were] still there." In response to the court's question, "Do you think you can judge this case based only on the evidence that was presented in the courtroom?" the juror answered, "Hearing all the evidence, I believe I can."

Kalamkarian asserts "[t]he trial court . . . precluded defense counsel from obtaining an explanation from Juror No[.] 9 about her continuing hesitation over whether she could be impartial." Assuming for argument's sake that counsel have a right to question a seated juror after voir dire is over and before deliberations begin,[4] it was defense counsel who interrupted Juror No. 9 before she could complete her answer. Counsel asked, "Despite your own personal feelings, do you think you can remain fair and impartial in this case?" Juror No. 9 began to answer: "I think I can, but I can see --." Counsel interrupted: "I sense that there are some doubts so --." At that juncture, the court told Juror No. 9, "That's all you need to say." In response

---

[4]     Cf. *People v. Cleveland* (2001) 25 Cal.4th 466, 485 [permitting attorneys for the parties to question deliberating jurors is fraught with peril and generally should not be permitted; court may allow counsel to suggest areas of inquiry or specific questions to be posed by the court].

to the prosecutor's questions, Juror No. 9 confirmed she could base her decision solely on the evidence.

As our Supreme Court has stated, the trial court is in the best position to assess the demeanor and believability of jurors. (*Beeler*, *supra*, 9 Cal.4th at p. 989; *People v. Turner* (1994) 8 Cal.4th 137, 205.) The trial judge watched and listened to Juror No. 9 when she said, "Hold on. Let me think about it." He was in the best position to determine whether Juror No. 9 truly was hesitant about her ability to be impartial, or whether she was simply thinking carefully about her feelings and views before confirming that she could judge Kalamkarian's case based solely on the evidence and not on her experience as a child. The court told counsel, "I did not sense any ambiguity." The record reflects that the court was persuaded the juror could perform her duties. (*Bennett*, *supra*, 45 Cal.4th at p. 621.) We see no abuse of discretion.

## DISPOSITION

We affirm Haroutioun Kalamkarian's judgment of conviction.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



EDMON, P. J.



KALRA, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.